UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
────────────────────────────────
UNITED STATES OF AMERICA,

                 Plaintiff,

-against-

ROBERT HOMER,

                 Defendant.
────────────────────────────────

**MEMORANDUM & ORDER**

**23-CR-00086 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court is a motion to suppress evidence that resulted from an unlawful arrest. Fed. R. Crim. P. 12(b)(3)(C); U.S. Const. amend. IV.; (*see* Mot. to Suppress (Dkt. 23).) Defendant Mr. Robert Homer was arrested on February 14, 2023, and charged as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Mot. to Suppress at 3.) Mr. Homer argues that the government did not have probable cause to arrest him. (*Id.* at 7.) The court agrees. For the following reasons, Mr. Homer's motion to suppress is GRANTED.

**I. MR. HOMER'S ARREST**

At 2:18 a.m. on February 14, 2023, New York City Police Department ("NYPD") Detective Nicholas Conte began surveilling a group of people, including Defendant Robert Homer, on Guy R. Brewer Boulevard between 134th Avenue and 137th Avenue in Queens, New York from a NYPD ARGUS camera. (Transcript for October 26, 2023 Suppression Hearing ("Hearing Tr.") at 13:9, 13:23-25, 24:25-25:7, 25:22-26:2.)[1] Mr. Homer was seated in

---

[1] An ARGUS camera is a camera that the New York Police Department places in "high-crime area[s] that can capture incidents that might occur." (*Id.* at 19:17-18) The ARGUS system records the footage and allows Department detectives to manually control the movement and zoom of the cameras in real time. (*Id.* at 20:19-22.)

1

the driver's seat of a silver minivan. (*Id.* at 18:12, 28:17-23.) Detective Conte stated that he recognized the minivan as a vehicle used by a local gang that he was investigating, but he could not identify the minivan's license plate nor did he recognize any of the people in the car, including Mr. Homer. (*Id.* at 28:8-19, 56:7-13, 58:20-59:5.) At 2:21 a.m., Detective Conte observed the man in the driver's seat, who he later determined was Mr. Homer, place a black handgun into his pants pocket and noted that Mr. Homer did not have "firearm discipline." (*Id.* at 29:9-12, 31:16-17.) Up until this moment, Mr. Homer had not done anything that Detective Conte found to be suspicious or indicative of criminality. (*Id.* at 58:12-19.) According to his testimony, Detective Conte immediately called Officer Anthony Lombardi, an officer on patrol that night, and alerted him that the driver of the silver minivan had a gun. (*Id.* at 18:19-24.) After Detective Conte saw Mr. Homer place the gun into his pocket, Mr. Homer left the car to order something at the deli, and then returned to the driver's seat of the silver minivan. (*Id.* at 33:2-25.) Detective Conte stated that he was on the phone with Officer Lombardi up until Officer Lombardi arrived to the section of Guy R. Brewer Boulevard that Detective Conte was surveilling. (*Id.* at 31:18-25.) At 2:25 a.m., NYPD officers pulled up to the silver minivan that Detective Conte observed and then immediately arrested and disarmed Mr. Homer. (*Id.* at 34:13-35:19.)

## II. LEGAL STANDARD

The Fourth Amendment protects the public against unreasonable searches and seizures, including arrests. *See Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 364 (2017). Thus, pursuant to the Fourth Amendment, law enforcement officials generally must obtain a search warrant in order to seize an individual's property. *See United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994). "The warrant requirement creates a presumption that any warrantless search or seizure is unconstitutional, and requires that evidence

obtained in such illegal searches be excluded from trial." *Id.*[2] A warrantless arrest is unreasonable unless the arresting officer has probable cause to believe that a crime is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The government has the burden to demonstrate that its agents had probable cause to justify a warrantless arrest. *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008).

Probable cause is a "practical, nontechnical conception" that is "incapable of precise definition or quantification." *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003). The inquiry is fact intensive and depends on the totality of the circumstances. *Id.* at 371. An officer has probable cause if, based on an objective view of the facts, there is reasonable ground for belief of guilt particularized with respect to the subject of the search or seizure. *Id.*; *see also D.C. v. Wesby*, 583 U.S. 48, 54 n.2 (2018). The inquiry focuses on the "facts and circumstances within the officers' knowledge" at the time of the arrest. *United States v. Ginsberg*, 758 F.2d 823, 828 (2d Cir. 1985). Observations of otherwise lawful activity can support a finding of probable cause when that conduct, based on a police officer's experience and expertise, is indicative of criminal activity. *See Delossantos*, 536 F.3d at 161.

### III. DISCUSSION

Mr. Homer seeks to suppress "all evidence recovered as a fruit of his unlawful arrest, pursuant to Fed. R. Crim. P. 12(b)(3)(C)," including the .45 Glock semiautomatic pistol and ammunition that Officer Lombardi recovered during the arrest.[3] (Mot. to Suppress at 1.) The arresting officer did not have probable cause to

---

[2] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

[3] Detective Conte saw Mr. Homer's possession of a firearm in plain view of the ARGUS camera. (Hearing Tr. at 29:9-12.) Therefore, it is possible that

arrest him, Mr. Homer contends, and so the seizure was unreasonable in violation of the Fourth Amendment. (*Id.* at 6-8.) The government disagrees. (*See* Post-Hearing Mem. in Opp. (Dkt. 46) at 6-11.) The question before the court in this case is whether, after the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the arresting officer had probable cause when he saw a person with a firearm in public but did not know the person's identity. The court holds that the officer did not have probable cause and therefore GRANTS Mr. Homer's motion to suppress.

### A. *Bruen* and New York's Firearm Licensing Regime

Prior to the Supreme Court's decision in *Bruen*, New York granted licenses for carrying a firearm outside of the home only upon a showing of "proper cause." N.Y. Penal Law § 400.00(2)(f) (2022). This was an exacting standard. In order to demonstrate proper cause, an applicant had to make a showing that he or she has a "special need for self-protection distinguishable from that of the general community." *Bruen*, 597 U.S. at 12 (citing *In re Klenosky*, 428 N.Y.S.2d 256, 257 (N.Y. App. Div. 1980)). Living or working in an area with elevated crime rates was not enough. *Id.* at 12-13. Instead, applicants were required to provide specific evidence of recurrent threats to life or safety. *Id.* at 13.

In *Bruen*, the Supreme Court struck down the "proper cause" requirement as violating the Second and Fourteenth Amendments. *Id.* at 17. After analyzing historical statutes to clarify the original scope of the Second Amendment, the Court held

---

the evidence that is the fruit of the unlawful search is not the physical evidence, but Mr. Homer's identity, including his status as a felon. *See, e.g., United States v. Olivares-Rangel*, 458 F.3d 1104, 1112 (10th Cir. 2006). However, the parties did not raise this issue, and the broad language of Mr. Homer's motion to suppress—all evidence that stemmed from the arrest—covers evidence of identity.

that the exercise of the constitutional right to carry a firearm for self-defense in public could not depend on demonstrating a special need to a government official. *See generally id.* However, the Court affirmed the existence of longstanding laws that forbid the carrying of firearms in "sensitive places." *Id.* at 30.

After the Supreme Court's decision in *Bruen*, New York Governor Kathy Hochul convened an extraordinary session of the New York State Legislature to pass new gun safety legislation. *See Antonyuk v. Chiumento*, 89 F.4th 271, 289-90 (2d Cir. 2023). The state legislature passed the Concealed Carry Improvement Act ("CCIA") in July 2022, with an effective date of September 2022. *Id.* In relevant part, the Act changed the process by which licensing officers would grant a license for a pistol or revolver: "A license for a pistol or revolver . . . shall be issued to . . . have and carry concealed, without regard to employment or place of possession subject to the restrictions of state and federal law, by any person." N.Y. Penal Law § 400.00(2)(f). The CCIA also required applicants to provide character references, verification that the applicant had completed sixteen hours of in-person safety training, and to pass a written test and demonstrate firearm proficiency in live-fire range training. *See Antonyuk*, 89 F.4th at 290.

### B. *Bruen* and Probable Cause

The government asserts that it has satisfied its burden to establish that the NYPD had probable cause to arrest Mr. Homer without a warrant, and that *Bruen* "has nothing to do with a probable cause determination." (Post-Hearing Mem. in Opp. at 2, 10.) The government's argument is as follows: New York law prohibits possession of a firearm. (*See id.* at 10 (citing N.Y. Penal Law §§ 265.01, 265.01-b).) NYPD Detective Conte saw Mr. Homer with a firearm. (*Id.* at 11.) Therefore, the NYPD had probable cause to arrest Mr. Homer. (*Id.*)

5

The government cites to Second Circuit case law to argue that an arresting officer has probable cause to arrest a person he or she sees with a gun. But the facts of the cases that the government relies on differ from the circumstances of Mr. Homer's arrest in crucial respects. The government cites to *United States v. Scopo*, for example, asserting that the Second Circuit reversed the district court's suppression of a firearm after a warrantless search because "the mere presence of a partially concealed firearm is highly and immediately incriminating." (Post-Hearing Mem. in Opp. at 7 (citing *Scopo*, 19 F.3d at 782).) But the government mischaracterizes *Scopo*. In *Scopo*, the arresting officer had probable cause because the defendant committed a traffic violation. *Scopo*, 19 F.3d at 781. At that point, the officer had probable cause to arrest. During the traffic stop, but after the officer already had probable cause, the officer saw the defendant throw something into the "grab space." *Id.* at 782. The search of the grab space that revealed a "partially concealed firearm" was therefore a lawful search for which probable cause was already established. *Id.* It was not relevant that the probable cause was premised on a traffic violation. *See id.* ("[A]s long as a valid basis for a detention and search exists[,] it is not rendered invalid by the fact that police resort to a pretext for one purpose or another to continue that detention and search.")

The government's reliance on *United States v. Vasquez*, is similarly flawed. 864 F. Supp. 2d 221 (E.D.N.Y. 2012). In *Vasquez*, the police saw the defendant with a handgun and arrested him. *Id.* at 239-40. But during the arrest and prior to the recovery of the firearm, the defendant stated that he was on parole. *Id.* at 223. The officers therefore had probable cause to believe that the defendant was committing the crime of being a felon in possession of a firearm. *Id.* at 240. As discussed in more detail below, this would have been sufficient to establish probable cause even

6

after *Bruen*. Unlike in *Vasquez*, however, Mr. Homer did not reveal his prior criminal record or that he lacked a firearm license to the arresting officers.

Case law aside, the government nevertheless argues that *Bruen* does not affect the probable cause determination because of the structure of New York's penal statutes. (Post-Hearing Mem. in Opp. at 10.) Specifically, when the statute that defines a crime does not contain an exception, but an exemption from prosecution exists in a different section of the penal code, the exemption is understood under New York law as an affirmative defense that the defendant can raise. (*Id.* (citing *People v. Washington*, 209 A.D.2d 162, 163 (N.Y. App. Div. 1994)).) The licensing provision here that exempts firearm license holders from prosecution, N.Y. Penal Law § 265.20(a)(3), is separate from the section of the penal code that prohibits possession of a firearm. *See, e.g.*, N.Y. Penal Law §§ 265.01, 265.01-b. And as affirmative defenses are not a part of the probable cause inquiry, the government asserts that "*Bruen* does not affect the probable cause calculus in this case whatsoever." (Post-Hearing Mem. in Opp. at 10.)

Indeed, the court believes that the government places too much weight on the New York state court's decision in *People v. Washington*, 209 A.D.2d 162 (N.Y. App. Div. 1994). The *Washington* court cited *People v. Kohut* to stand for the general proposition that exceptions outside of the defining statute are affirmative defenses. *Id.* (citing *People v. Kohut*, 30 N.Y.2d 183, 187 (N.Y. 1972)). But the *Kohut* court made this statement as an explanation of the longstanding rule regarding timeliness and tolling and did not appear to be creating a new rule generally. *See People v. Kohut*, 30 N.Y.2d 183, 187-89 (N.Y. 1972). In the statute of limitations context, the *Kohut* court explained that prosecutors were not required to plead that an exception to the statute of limitations applied; instead, when "the offense appears by the general provisions to be barred, yet, . . . in truth it is not by reason of

some exception, [the prosecutor] may state the true time, and the indictment will not be held to be bad on its face." *Kohut*, 30 N.Y.2d at 189.

A rule created for statutes of limitations does not automatically apply to all exceptions, despite the broad language in *Kohut*.[4] That is because statutes of limitations are generally treated as procedural under New York law. *See City of Aventura Police Officers' Ret. Fund v. Arison*, 134 N.Y.S.3d 662, 677 (N.Y. Sup. Ct. 2020). When the limitations period has passed, that extinguishes the remedy, not the underlying right. *Id.* In the criminal context, the plaintiff—the government—loses the remedy of prosecution when the allotted time period has expired, but it does not change the fact that a crime occurred and the right was violated. The *Kohut* court itself distinguished statutes of limitations as "neither exceptions nor provisos," saying instead that they are affirmative defenses because of a "long and all but unbroken series of precedents holding that indictments are not insufficient merely because on the facts alleged the crime may be time-barred." *Id.* at 187-88. The court does not find it appropriate to apply *Kohut's* rule concerning statutes of limitations to the licensing exception to prosecution created under N.Y. Penal Law § 265.20(a)(3). "Individuals holding a firearm license are exempt from most (but not all) of New York's criminal prohibitions on firearm possession." *Antonyuk*, 89 F.4th at 305 (citing N.Y. Penal Law § 265.20(a)(3)). Unlike statutes of limitations, whether the licensing exception applies is relevant to whether a crime occurred—it

---

[4] The New York Court of Appeals agrees that the assessment of whether an exception is an element of the crime or an affirmative defense is more properly determined through statutory interpretation than through analyzing the structure of the statutes. *See, e.g., People v. Davis*, 13 N.Y.3d 17, 20-21 (N.Y. 2009) (not requiring indictment to plead that exception did not apply even though it was in the statute that defined the offense); *People v. Santana*, 7 N.Y.3d 234, 236 (N.Y. 2006) (same).

8

does not just affect the government's ability to seek a remedy via prosecution.

By disregarding licensing in the probable cause inquiry, the government skips a step. In the pre-*Bruen* world, the court agrees that a police officer likely would have had probable cause to arrest someone that the officer observed in a high crime area at night with a firearm. *See United States v. Sheffield*, No. 96-cr-1279, 1996 WL 629735, at *1-2 (2d Cir. 1996) (Summary Order). But that is not because licensing is irrelevant to the inquiry. Instead, under the proper cause licensing regime, a police officer of reasonable caution could have concluded, based on his or her experience and expertise, that the person in possession of a gun would have been unlikely to have satisfied the requirement of documenting "extraordinary personal danger" that would have been required to acquire a firearm license. *See Bruen*, 597 U.S. at 13 (quoting *In re Kaplan*, 673 N.Y.S.2d 66, 68 (N.Y. App. Div. 1998)). The licensing regime was strict enough that a reasonable officer could have disregarded whether someone with a gun had a firearm license because licenses were so difficult to acquire that it was unlikely to be relevant for determining whether someone in possession of a gun was committing a crime. *Cf. People v. Davis*, 13 N.Y.3d 17, 31 (N.Y. 2009) (holding that the government did not have to address the exception to prosecution for being in a park after hours because "common sense" dictated that it would not apply).

After *Bruen*, however, the licensing exception takes on greater import. In response to the Supreme Court's decision, the New York legislature amended § 400.00(2)(f) to alter the firearm licensing regime from one in which licensing officers had discretion to determine whether an applicant had proper cause to one in which licensing officers "shall" issue a license to "any person." N.Y. Penal Law § 400.00(2)(f); *see also Antonyuk*, 89

F.4th at 290.[5] For the purposes of this inquiry, the practical effect of the amendment to § 400.00(2)(f) is to make gun licenses for public carry significantly more accessible. The licensing exception that police could have reasonably disregarded before *Bruen* was substantially broadened so that police can no longer reasonably assess whether a person was committing a crime without taking the exception into account.

Ultimately, the government offers a technical explanation for what is meant to be a nontechnical, practical inquiry. *See Pringle*, 540 U.S. at 370. From a nontechnical, practical perspective, it cannot be the case that a dramatic expansion of the scope of conduct that is permissible under the Constitution has no effect on the scope of an individual's freedom from unreasonable intrusions by law enforcement. When an exemption from prosecution is sufficiently broad, the government's technical separation of affirmative defenses from the probable cause analysis would allow law enforcement to search and seize persons based on primary conduct that is legal. The government's focus on the technical obfuscates the real inquiry here: whether, after *Bruen*, a police officer that sees an unidentified person with a gun has an objectively reasonable ground to believe that the person is guilty of a crime.

### C. Application to Mr. Homer's Arrest

To establish probable cause, the government must point to facts in the lead up to the arrest that indicate to the arresting officer,[6]

---

[5] The applicant must still take certain classes and demonstrate firearm proficiency and safety and provide character references to the licensing officer. But once the applicant provides the required application materials, the licensing officer has limited discretion and "shall" grant the license. N.Y. Penal Law § 400.00(2)(f).

[6] The government asserts that the arresting officer, NYPD Officer Lombardi, had specific knowledge that Mr. Homer had a firearm because

based on his experience and expertise, that Mr. Homer did not have a license to carry the firearm. Detective Conte testified that he was surveilling the section of Guy R. Brewer Boulevard in which Mr. Homer was arrested because of suspected gang activity that occurred there. (Hearing Tr. at 15:20-16:17.) He further testified that the silver minivan that Mr. Homer was driving was a vehicle associated with gang activity. (*Id.* at 28:6-9.) And he testified that Mr. Homer had no firearm discipline—Mr. Homer placed the gun directly into his pants pocket. (*Id.* at 31:16-17.) Up until seeing the gun, Detective Conte did not see Mr. Homer doing anything suspicious or indicative of criminality. (*Id.* at 58:12-19.) After Detective Conte saw that Mr. Homer was in possession of a gun, Mr. Homer left the car, picked up something from the deli that Mr. Homer was parked in front of, and got back into the car. (*Id.* at 33:2-25.) Shortly thereafter, Officer Lombardi arrested Mr. Homer and recovered the firearm. (*Id.* at 34:13-35:19.) Based on this record, the court is left to determine whether the facts and circumstances known to Officer Lombardi (by way of Detective Conte) were sufficient to warrant the belief that Mr. Homer did not legally possess the firearm.

Whether a location is a high crime area is relevant because lawful activity in certain areas can be indicative of unlawful activity. For example, in *Gonzalez v. City of Schenectady*, the defendant said,

---

Detective Conte, via the ARGUS camera, observed Mr. Homer with a firearm and relayed that information to Officer Lombardi, and so the collective knowledge doctrine applies. (*See* Post-Hearing Mem. in Opp. at 14-15.) Detective Conte's account of how he reached Officer Lombardi on the night of the arrest is not entirely consistent—it is not exactly clear from the record how Detective Conte contacted Officer Lombardi. But given that Detective Conte testified that he was in a panic after seeing a firearm and that the ARGUS camera and Officer Lombardi's body-worn camera corroborate Detective Conte's account that the driver of the silver minivan was in possession of a gun, the court finds Detective Conte's account that he relayed the information to Officer Lombardi to be credible, even if the exact method through which he contacted Officer Lombardi was unclear.

11

"What do you need? I can get you whatever you need" in an area known for drug sales. 728 F.3d 149, 153 (2d Cir. 2013). Because of the area where the statement occurred, "[t]he police could intuit that [the informant and defendant] were not talking about prostitutes, absinthe, or Cuban cigars." *Id.* at 157-58. The location is therefore relevant because it provides the context in which police can, based on their experience and expertise, infer criminal activity from otherwise benign activity. But suspicious conduct in a high crime area, without more, is not necessarily enough to establish probable cause. Indeed, in *Gonzalez*, the Second Circuit found that the police did not have probable cause to arrest the defendant because there were "several contingencies" between the defendant's statement and actually possessing or selling drugs. *Id.* at 157.

In Mr. Homer's case, there is also one important contingency—namely, that Mr. Homer could have plausibly been licensed to carry the firearm. In fact, Justice Alito noted that firearm possession for self-defense is often most necessary in high-crimes areas like the one in which Mr. Homer was arrested. *Bruen*, 597 U.S. at 73-74 (2022) (Alito, J., concurring) (noting that the "ubiquity of guns and our country's high level of gun violence" are the "very facts that cause law-abiding citizens to feel the need to carry a gun for self-defense. . . . Some of these people live in high-crime neighborhoods."). Up until Detective Conte saw that Mr. Homer was in possession of a firearm, Mr. Homer's behavior was not suspicious or otherwise indicative of criminal behavior.

To be sure, the court cannot pick apart the circumstances leading up to Mr. Homer's arrest—the probable cause inquiry is based on a totality of the circumstances. *Pringle*, 540 U.S. at 371. Mr. Homer was not just a person with a firearm in a high-crime area. He was also the driver of a silver minivan that Detective Conte testified was associated with a local gang. And Mr. Homer did

not handle the firearm carefully, placing it directly in his pants pocket.

However, the court finds the connection between the silver minivan that Mr. Homer was operating and the local gang to be tenuous at best.[7] And the "shall issue" standard for licensing under the revised § 400.00(2)(f) is broad enough that even alleged gang membership would not necessarily preclude the licensing officer from granting a firearm license. Applicants must submit character references and public social media pages, take sixteen hours of training, and pass a written exam and a firearm proficiency test. The Second Circuit affirmed an injunction of the revised law's requirement that applicants submit their private social media pages for review. *Antonyuk*, 89 F.4th at 307. It is not clear that these requirements would be effective at weeding out purported gang members from applying for and receiving licenses to publicly carry firearms. And while a lack of firearm discipline is inconsistent with the training that one would have to undergo to acquire a license to carry a firearm, it is too large a leap to conclude that lack of firearm discipline implies that the firearm is unlicensed. Because the licensing officer "shall issue" a license to any applicant that satisfies the requirements, even improperly securing a firearm in a vehicle purportedly associated with a gang is not enough for a reasonably cautious police officer to assume that the possessor of the firearm is unlicensed. Felons are, of course, still prohibited from possessing a firearm under federal law. *See* 18 U.S.C. § 922(g)(1). But a reasonably cautious police officer would not assume that an unidentified alleged gang member was a felon. The court therefore concludes that Officer Lombardi lacked probable cause to arrest Mr. Homer.

---

[7] Detective Conte could not identify the van's license plate, nor did he recognize any of the van's occupants, yet he claimed to recognize that particular silver minivan as connected to the local gang based on seeing it during video surveillance once before.

It is worth noting the steps that Officer Lombardi and his fellow arresting officers did not take. Detective Conte and Officer Lombardi did not know Mr. Homer's identity and therefore could not look up whether Mr. Homer had a license or whether he was a felon prior to the arrest. (Hearing Tr. at 58:20-22.) But New York law provides police officers with the tools to ensure that they can stop and identify individuals they reasonably suspect are committing or have committed a crime. *See* N.Y. Crim. Proc. Law § 140.50; *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968) (articulating the reasonable suspicion standard). Even after *Bruen*, police officers have reasonable suspicion to justify a *Terry* stop when seeing someone they suspect has a gun. *See United States v. Hagood*, 78 F.4th 570, 577 (2d Cir. 2023). A *Terry* stop in Mr. Homer's case would not have meaningfully disrupted his arrest—the arresting officers could have quickly uncovered Mr. Homer's felon status with a license check. *See United States v. Bernacet*, 724 F.3d 269, 272 (2d Cir. 2013) (noting that it "typically took less than one minute to run each of the license checks"). And because Officer Lombardi would have had a reasonable suspicion that Mr. Homer was armed, he and his fellow arresting officers could have conducted a *Terry* frisk to remove the gun while they determined, after running the license check, whether there was probable cause to arrest Mr. Homer. *See United States v. Weaver*, 9 F.4th 129, 147 (2d Cir. 2021) (citing *Terry v. Ohio*, 392 U.S. 1, 10 (1968)) ("[A] frisk is a more intrusive invasion of a person's security than a stop. Nevertheless, . . . a frisk [is] a minor inconvenience and petty indignity in light of the need for law enforcement officers to protect themselves and other prospective victims of violence."). The police in New York have the tools to ensure that they protect the right of the public to be free from unreasonable searches and seizures while preventing the unlawful possession and carrying of firearms. But they declined to use the tools here.

## IV. CONCLUSION

For the foregoing reasons, the government did not meet its burden to establish by a preponderance of the evidence that Officer Lombardi had probable cause to arrest Mr. Homer. Accordingly, Mr. Homer's motion to suppress is GRANTED.

SO ORDERED.

Dated:  Brooklyn, New York
        February 5, 2024

s/NICHOLAS G. GARAUFIS
NICHOLAS G. GARAUFIS
United States District Judge
