1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,     :    23-CR-86(NGG)
4
5          -against-           :    United States Courthouse
                                    Brooklyn, New York
6
ROBERT HOMER,                 :
7                                   October 26, 2023
              Defendant.      :     10:00 o'clock a.m.
8
     - - - - - - - - - - - - - X
9

10                     TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
11               UNITED STATES DISTRICT JUDGE.

12
APPEARANCES:
13

14  For the Government:        BREON PEACE
                               United States Attorney
15                             BY: RAFFAELA BELIZAIRE
                                   ANDREW GRUBIN
16                             Assistant United States Attorneys
                               271 Cadman Plaza East
17                             Brooklyn, New York

18
    For the Defendant:        FEDERAL DEFENDERS OF NEW YORK INC.
19                             One Pierrepont Plaza, 16th Floor
                               Brooklyn, NY 11201
20
                               BY: MARISSA SHERMAN, ESQ.
21

22  Court Reporter:           Charleane M. Heading
                               225 Cadman Plaza East
23                             Brooklyn, New York
                               (718) 613-2643
24
Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

1          (In open court.)

2          THE CLERK:  Criminal cause for a hearing.

3          Beginning with the government, please state your

4     appearances.

5          MS. BELIZAIRE:  Good morning, Your Honor.  Raffaela

6     Belizaire, for the government.  Also with me is AUSA Andrew

7     Grubin, for the government.

8          Also at the government table is Detective Omar Garib

9     and Paralegal Stephanie Heyward.  Good morning.

10          THE COURT:  Good morning.

11          MS. SHERMAN:  Good morning, Your Honor.  Marissa

12     Sherman, on behalf of the Federal Defenders of New York, on

13     behalf of Robert Homer, who is present to my left.

14          Also at the counsel table is Mahathi Kumar, a legal

15     intern with the Federal Defenders of New York, as well as

16     Anneliese Merry, a paralegal with the Federal Defenders.

17          THE COURT:  Fine.

18          And, Ms. Kumar, where do you go to law school?

19          THE INTERPRETER:  NYU.

20          THE COURT:  Welcome.

21          All right.  Everyone may be seated.

22          I have some preliminary questions to ask.  Who are

23     the witnesses that you are going to have here?

24          MS. BELIZAIRE:  The government is calling one

25     witness, Detective Nicholas Conte.

1      THE COURT:  And he's not in the room?

2      MS. BELIZAIRE:  He's not in the room, Your Honor.

3      THE COURT:  I think there's an issue having to do

4  with materials that the government, the defense has requested

5  before this hearing so that they can be prepared to

6  cross-examine the witness; and it would appear to me that this

7  would be 3500 material, wouldn't it, for trial?

8      MS. BELIZAIRE:  For trial, perhaps.

9      THE COURT:  Well, for any proceeding.  You know, the

10 general rule has been that, or unless your office has changed

11 its policies, that these are the types of materials that would

12 be utilized by, could be utilized by the defense in

13 preparation for a hearing.

14     MS. BELIZAIRE:  Well, Your Honor, I see two separate

15 things.  3500 material relates to statements or written

16 documents relating to the witness who is testifying, Detective

17 Conte.  He is not the arresting officer who they are seeking

18 the materials from and other officers, none of whom are

19 testifying at this hearing.

20     THE COURT:  Why is he testifying?

21     MS. BELIZAIRE:  He's -- as Your Honor may remember,

22 this case stems from a detective, Detective Conte, who will be

23 testifying, watching the ARGUS camera in the police precinct

24 and seeing the defendant with a gun on video camera on the

25 ARGUS camera.  He then communicates to the public safety

1    officers, who then deploy to the location and arrest the

2    defendant with the gun in his pocket.

3           The hearing, as I understand it, both from the

4    submissions and the argument that we had, is what was, what

5    did Detective Conte see on the ARGUS camera and what did he

6    communicate to Officer Lombardi.  So, in order to meet that

7    threshold question, I am calling Detective Conte to answer

8    those questions.

9           Of course, the government's position is that a

10   hearing is not necessary because there is no fact in dispute.

11   There has been no affidavit provided by the defense to dispute

12   a material fact.

13          However, to reach my burden that there was probable

14   cause for the arrest, the government's position is I will only

15   need to call Detective Conte.  I do not need to call Officer

16   Lombardi.  The defense has asked me to make that witness

17   available, should they want to call him, but there is no

18   certainty that they will want to call Officer Lombardi.

19          THE COURT:  And if they did decide they wanted the

20   other officers to be called, would those materials then be

21   germane to the testimony of those other officers under (a)(1),

22   16(a)(1).

23          MS. BELIZAIRE:  Well, so then as a matter of Rule --

24   as a matter of Rule 16 discovery, the government's position is

25   that none of the materials that we have, setting aside 3500

1   material, are material to the defense, a defense that I can

2   only speculate based on the defendant's statements at the time

3   of arrest that the officers planted a gun on him.  I otherwise

4   don't know what the defense is, and so it's difficult to make

5   out what materiality will be without knowing that.

6           So as a matter of Rule 16, the government's position

7   is that Rule 16(a)(2) expressly excludes this material and

8   references 3500.  <u>Brady</u>, and of course <u>Brady</u> and <u>Giglio</u> would

9   always be turned over.

10          I have combed through all the material.

11          THE COURT:  You have what?

12          MS. BELIZAIRE:  Combed through all the material.  I

13  have provided the Rule 16 discovery on a rolling basis.  I

14  made a production on April 5th of 2023, June 14th of 2023, and

15  I provided a few additional body-worn camera on October 19,

16  2023, most of which is after the moment of apprehension, which

17  is of course a subject matter of this hearing.

18          So, as a matter of Rule 16, the defense would have

19  to make out that it's material to the defense.  The defense,

20  as I understand it, at this point, is that the officers

21  planted the gun on him.

22          None of that, none of the material that they are

23  seeking is Rule 16 discovery.  It may be 3500 material, which

24  I would turn over, of course, in due time, as witnesses

25  testify; but some of the materials they're requesting are from

1  witnesses who may never testify and whose paperwork may never

2  become discoverable or 3500 material.

3          THE COURT:  What about that?

4          MS. SHERMAN:  Sure.  Would you prefer that I sit

5  with the mic or, microphone or stand?

6          THE COURT:  Oh, just sit.

7          MS. SHERMAN:  Okay.  Thank you.

8          So a couple of things in response to that.

9          The materials that I've requested that I've

10  submitted would be materials in the preparation of the defense

11  is the preparation of the defense of the hearing, not a trial

12  defense.  So whether my defense at trial would be that they

13  put the gun on him or not, that's actually not what's at issue

14  for the hearing.

15          What's at issue for the hearing is whether there was

16  probable cause to arrest Mr. Homer.  And what goes to that

17  issue is the circumstances of his arrest.

18          The materials that I've requested are pretty basic

19  discovery materials and specifically the arrest report, the

20  complaint report, memo books, which are kept actually for

21  transparency of where police officers are during their duty,

22  during their shifts.

23          The rule that the government is referring to, which

24  says that certain things are not subject to disclosure, refers

25  to internal government documents made by an attorney for the

1   government or other government agent.

2           THE COURT:  Yes, I've read it.

3           MS. SHERMAN:  Right.  So this isn't work product

4   that I'm requesting.  Arrest reports, complaint reports, memo

5   books, those are reports that are generated as part of every

6   single arrest that's made by the NYPD, and it goes, I haven't

7   been able to see them because they haven't been turned over,

8   so I can't specifically say what in those materials would be

9   material to the defense here, but --

10          THE COURT:  Are you saying that you can't decide who

11  to call as a witness at a suppression hearing until you see

12  these reports, is that it?  I mean, what is the reason you

13  need it for this, this witness, who's only going to testify

14  that he was looking at a, he was looking at a screen in a

15  precinct and what he saw?

16          MS. SHERMAN:  Because I think, and I requested these

17  materials in my original motion for the same reason.  I

18  understand that this is what the government, this is the

19  witness the government is choosing to call and to meet their

20  burden with and that's, that's fine.

21          I'm not asking for written statements from officers

22  that are not testifying; but they, the government, is relying

23  on and has been relying on this, what this officer allegedly

24  saw in the complaint report.  There's, it details that.  The

25  complaint, I'm sorry, not the report, the complaint that was

1   filed by the government in this case.

2          And so --

3          THE COURT:  You have the complaint.

4          MS. SHERMAN:  Correct.  So inevitably, at any time

5   there's a, if there's a complaint report generated by the

6   New York Police Department, if there's an arrest report

7   generated by the New York Police Department, it's going to

8   contain information about the circumstances of the arrest

9   including what Detective Conte allegedly observed.

10         So I can't, without having the opportunity to look

11  at that, I can't say whether this is information that is,

12  would be central to the cross of this witness because I

13  haven't seen it; but my understanding of what's going to be

14  addressed here is not only what Detective Conte saw but I

15  actually think it's also relevant not just what he

16  communicated to other officers and specifically the arresting

17  officer, Officer Lombardi, but what Officer Lombardi knew at

18  the time he made the arrest.

19         This isn't a -- I understand it's a short period of

20  time, but this is not an instant.  These are not officers all

21  on the scene together.  It's about four minutes between when

22  Detective Conte sees, allegedly sees what he sees and the

23  arrest is made; and there's, under the complaint, under the

24  response from the government to the motion, there is a fair

25  amount of communication going on between these officers in

1  that period of time, and in any, in any type of police reports

2  that are generated as a result of arrest, that information

3  should be in those reports.

4          And so, I think it's important and central to the

5  issue of whether there is probable cause to arrest Mr. Homer.

6  I think it is essential to this particular hearing.

7          And I just would say I've done a few of these

8  hearings.  We've gotten these documents turned over routinely.

9  This is the first time that I've requested these types of

10 documents and haven't received them from the government, and

11 I, I don't -- again, I'm not requesting internal documents

12 between, you know, between police officers.

13         These are reports that are generated that are

14 available to the public upon request.  Memo books, as I said,

15 are kept for transparency sake.

16         My understanding is that Detective Conte is going to

17 testify that he communicated to officers in the precinct.  So

18 the memo books of the officers saying when they're in the

19 precinct is relevant to this hearing and is relevant to the

20 cross-examination of Detective Conte and his testimony.

21         So for those reasons, I actually think they are

22 germane to the cross-examination of Detective Conte,

23 particularly if this is the witness that the government is

24 intending to meet their burden with.

25         THE COURT:  What's the problem with giving -- my

1 understanding is that the government routinely gives this type

2 of information to the defense.  I'm just wondering why this is

3 different.

4        MS. BELIZAIRE:  Well, again, Your Honor --

5        THE COURT:  You're trying to circumscribe the

6 function of this proceeding, and the defense is saying that

7 it's much broader than the government is claiming.

8        What is the injury to the government's case to

9 provide materials that it would be providing later on anyway

10 for any witness who testifies at a trial?

11        MS. BELIZAIRE:  Well, first, Your Honor, I'm not

12 trying to circumscribe anything.

13        I am -- I have made clear that a hearing is not

14 necessary because there is no fact in dispute.

15        THE COURT:  I don't care what you think as to

16 whether a hearing is not necessary.  I've already said a

17 hearing is necessary.

18        MS. BELIZAIRE:  Okay.

19        THE COURT:  So why are you telling me something that

20 I've already decided?

21        MS. BELIZAIRE:  Well, in that case --

22        THE COURT:  And I don't like that.  That is not

23 right.

24        MS. BELIZAIRE:  Yes, Your Honor.

25        THE COURT:  You know, I looked at what you

1  submitted, I said a hearing is necessary, you need to do a

2  hearing; and I'm just saying that generally speaking, I have

3  never in 24 years had anyone tell me that this kind of

4  material was not necessary to be provided, and I'm just trying

5  to figure it out.  I didn't issue a decision because I wanted

6  to talk to you first.

7          MS. BELIZAIRE:  Yes, Your Honor.

8          My understanding from the submissions was that the

9  very witness to answer all of the questions was Detective

10 Conte.

11         THE COURT:  How can that be?

12         MS. BELIZAIRE:  Because, because what, what the

13 defense submission is is there are hypothetical questions

14 posed in defense submission, what did Detective Conte see,

15 what did he say to Officer Lombardi.  So I could not call

16 Officer Lombardi to say what Detective Conte saw.  Only,

17 Officer Lombardi would only be able to say what Detective

18 Conte told him.  But part of the inquiry that was the basis

19 for the hearing was what Detective Conte saw.

20         So either this hearing would be Detective Conte and

21 Officer Lombardi or just Detective Conte alone.  So because

22 based on my preparations for this hearing, Detective Conte can

23 answer all these questions.

24         THE COURT:  Okay.  Let's have him testify on direct,

25 and then I'll hear from the defense after that.  Because if

1   all that Detective Conte is going to talk about is what he saw

2   and what he said to others, then, you know, what was written

3   by other people is, you know, not essential for the court to

4   make a ruling.  If the defense is planning to call other

5   witnesses, then the whole story may be different.

6             MS. BELIZAIRE:  Yes, Your Honor.  That's also the

7   government's position.

8             THE COURT:  It is?

9             MS. BELIZAIRE:  Yes, Your Honor.

10            THE COURT:  Well, I'm not ruling on your request is

11  what I'm saying, yet.

12            MS. SHERMAN:  I understand.

13            THE COURT:  Okay?  Let's take it one at a time.

14            MS. BELIZAIRE:  Okay.

15            THE COURT:  Are we ready?

16            MS. BELIZAIRE:  Yes, Your Honor.

17            THE COURT:  Okay.

18            MS. BELIZAIRE:  The government calls Detective

19  Nicholas Conte.

20            THE COURT:  Okay.  Please bring him in.

21            About how long do you think your questioning will

22  take?

23            MS. BELIZAIRE:  I think it will take about an hour,

24  because we're going to go through some video.

25            THE COURT:  Okay.  That's fine.  I just needed an

1   idea.

2          THE CLERK:  Sir, just raise your right hand, please.

3          (The Witness, DETECTIVE NICHOLAS CONTE, was

4   sworn/affirmed by the clerk of the court.)

5          THE CLERK:  Please have a seat.

6          THE WITNESS:  Thank you.

7          THE CLERK:  And please state and spell your full

8   name for the record.

9          THE WITNESS:  It's Detective Nicholas Conte, 113th

10  Detective Squad, Shield 6170.

11         THE COURT:  Spell your last name.

12         THE WITNESS:  C-O-N-T-E.

13         MS. SHERMAN:  Your Honor, do you mind if I move to

14  the other end of the table so I can --

15         THE COURT:  Of course.

16         MS. SHERMAN:  Thank you.

17         THE COURT:  You may inquire.

18         MS. BELIZAIRE:  Thank you, Your Honor.

19  DIRECT EXAMINATION

20  BY MS. BELIZAIRE:

21  Q    Where are you employed?

22  A    New York City Police Department.

23  Q    How long have you been with the New York City Police

24  Department?

25  A    Almost nine years.

1  Q    What is your position with the New York City Police
2  Department?
3  A    I'm a detective.
4  Q    How long have you been a detective?
5  A    Two years.
6  Q    Are you assigned to a particular precinct?
7  A    Yes.
8  Q    What precinct?
9  A    The 113th Precinct.
10 Q    Are you assigned to a particular unit within the 113th
11 Precinct?
12 A    Yes.
13 Q    Which one?
14 A    The 113 Detective Squad.
15 Q    How long have you been in the detective squad?
16 A    For three years.
17 Q    Okay.  And so, you mentioned you were a detective for two
18 years but been in the squad for three years.
19        What was your title in the other year you've been in
20 the detective squad?
21 A    Police officer.
22 Q    Do you have any special responsibilities in the 113th
23 Detective Squad?
24 A    I'm assigned to the shooting team.
25 Q    What is the shooting team?

1  A    I investigate shootings, homicides, and firearm-related

2  offenses.

3  Q    Okay.  Can you please detail your history in the NYPD,

4  starting with the academy.

5  A    I started the academy January of 2015, which lasted for

6  six months.  Then I was placed on 113 patrol in July of 2015.

7  From July of 2015 to April 2017, I did midnight patrol.

8  April 2017 until March 2020, I did anti-crime patrol.

9        Then from March 2020 until January of 2022, I was in

10  the 113th Detective Squad.  And then January of 2022 until

11  July of 2022, I was in violent crimes squad.  And then 2022

12  July to present, I'm in the 113th Precinct Detective Squad

13  shooting team.

14  Q    You mentioned you were temporarily assigned to the

15  violent crime squad while in the detective squad.

16        Can you tell us what your experience was with that?

17  A    I was assigned to a long-term investigation into the SNOW

18  gang in response to a recent homicide that occurred.

19  Q    And what is the SNOW gang?

20  A    SNOW gang is a group of individuals that hang out on

21  Guy R. Brewer Boulevard in between 134th Avenue, 137th Avenue,

22  Rochdale Village, and 140th Avenue.

23  Q    Approximately how many arrests have you made or assisted

24  in during your career?

25  A    Over 300.

1   Q    Approximately how many of those were gun arrests?

2   A    Over 100.

3   Q    In approximately how many of those gun arrests were

4   during your time in the violent crimes squad investigating the

5   SNOW gang?

6   A    Approximately five.

7   Q    What are the geographic boundaries of the 113th Precinct?

8   A    The 113th Precinct covers Jamaica, Queens, St. Albans,

9   and Springfield Gardens.

10  Q    And does that include the vicinity of Guy R. Brewer

11  Boulevard and 137th Avenue?

12  A    Yes.

13  Q    What can you tell us about that specific area, Guy R.

14  Brewer Boulevard and 137th Avenue?

15  A    I investigated a lot of violent crimes that occurred

16  there, from stabbings to shootings, within my time on patrol,

17  anti-crime, and detective squad.

18  Q    And is that location in Queens, New York?

19  A    Yes, it is.

20  Q    I'm going to direct your attention to February 14th of

21  2023.

22       Were you working that day?

23  A    Yes.

24  Q    And when did you start your -- approximately when did you

25  start working for that shift?

1   A    Approximately 4:30 p.m.

2   Q    Would that have been on February 13th into the 14th?

3   A    Yes.

4   Q    Okay.  Of 2023?

5   A    Yes.

6   Q    What was your assignment that day?

7   A    I was assigned to the 113th Precinct detective squad

8   shooting team.

9   Q    I'm going to direct your attention to approximately 2:00

10  to 2:30 a.m. on February 14, 2023.

11            Where were you at about that time?

12  A    In the 113th Precinct detective squad.

13  Q    And what were you doing?

14  A    I was monitoring ARGUS surveillance video that the NYPD

15  has.

16  Q    And why were you doing that?

17  A    To identify people who might be hanging out at locations

18  where there's violence.

19  Q    Is that something you do or did regularly?

20  A    Every day, I reviewed the ARGUS at different high-crime

21  areas in the 113.

22  Q    And specifically that camera, how frequently do you look

23  at that camera?

24  A    I review that camera daily.

25  Q    All right.  Over what period of time were you reviewing

1  that camera daily?

2  A    From February of 2023, I reviewed that camera about one

3  year prior to that, and I reviewed it every day from '23 to

4  present.

5  Q    So it's part of your daily activities?

6  A    Yes.

7  Q    And during that time on February 14th, 2023, between

8  about 2:00 and 2:30 a.m., did something happen while you were

9  watching the ARGUS camera?

10 A    Yes.

11 Q    Can you briefly describe what happened?

12 A    I saw a man driving a silver minivan, take a gun and put

13 it in his pants pocket.

14 Q    Okay.  And when you say you saw him driving a minivan,

15 what do you mean?

16 A    The car just went forwards and backwards a little bit.

17 That's the extent of the movement.

18 Q    And what did you do in response to seeing that?

19 A    I know the neighborhood safety team was in.  I got out of

20 my desk, panicking that I just saw someone with a firearm.  I

21 got up, I realized that I had no supervisor working so I could

22 not make the arrest myself.

23        So I immediately called Officer Lombardi to get him

24 to that location to arrest this person with a firearm.

25 Q    And what did you do once you were on the phone with

1  Officer Lombardi?

2  A    I told him there's a man driving a silver minivan and he

3  has a large black handgun and he has it in his pants pocket,

4  and I told him to be careful.

5  Q    We'll get back to some of though details, but was someone

6  ultimately arrested in connection with this incident?

7  A    Yes.

8  Q    Who was arrested?

9  A    Robert Homer.

10 Q    I'm going to ask that you look around the courtroom and

11 see if you recognize anyone in the courtroom as Robert Homer.

12 A    Yes.  He's wearing a gray dress shirt.

13       THE COURT:  Let the record indicate that the witness

14 has identified the defendant.

15       MS. BELIZAIRE:  Thank you, Your Honor.

16 Q    Now, could you tell us what is ARGUS camera?

17 A    ARGUS camera is an NYPD camera that's placed in a

18 high-crime area that can capture incidents that might occur.

19 Q    Okay.

20       THE COURT:  And where are these cameras situated?

21       THE WITNESS:  The cameras are on --

22       THE COURT:  This particular camera.

23       THE WITNESS:  This specific camera is on a utility

24 pole in between, on Guy R. Brewer Boulevard, in between

25 northbound and southbound traffic on the utility pole all the

1    way at the top.

2            THE COURT:  On an island, on a traffic island?

3            THE WITNESS:  Yes.

4            THE COURT:  Go ahead.

5            MS. BELIZAIRE:  Thank you.

6    Q    And how do you review ARGUS footage?

7    A    You log into the DOS system, and you can, there's a

8    camera tree and you can select what camera you want to review.

9    Q    Does everyone have access to view the ARGUS camera?

10   A    No.

11   Q    Who has access?

12   A    Supervisors and detectives.

13   Q    And do you have access?

14   A    Yes.

15   Q    Once an individual has access to ARGUS camera, can you

16   manually control the ARGUS camera?

17   A    Yes, you can.

18   Q    And how do you do that?

19   A    You can zoom in, zoom out, move left, right, up, and

20   down.

21   Q    Does the ARGUS camera record?

22   A    Yes, it does.

23   Q    What geographic area were you able to observe while

24   viewing this specific ARGUS camera?

25   A    On Guy R. Brewer Boulevard between 134th Avenue and 137th

1  Avenue.

2  Q    And was what you observed recorded?

3  A    Yes, it was.

4        MS. BELIZAIRE:  I'm going to show just the witness

5  only what has been marked as Government Exhibit No. 1.

6        Your Honor, permission to approach the witness with

7  the thumb drive?

8        THE COURT:  Yes.  Go ahead.

9  Q    Okay.  Showing you this thumb drive, do you recognize

10 this?

11 A    Yes.

12 Q    And what is this?

13 A    A thumb drive that I signed and dated.

14 Q    Okay.  And does it contain the ARGUS camera you just

15 described and labeled as Government Exhibit No. 1?

16 A    Yes, it does.

17 Q    Is it a fair and accurate depiction of what you were

18 observing on the night of February 14, 2023?

19 A    Yes.

20 Q    And are the date and time stamps accurate?

21 A    Yes.

22 Q    And how do you know?

23 A    I compared it to my NYPD computer.

24       MS. BELIZAIRE:  At this time, Your Honor, I offer

25 Government Exhibit No. 1 into evidence.

1          THE COURT:  Any objection?

2          MS. SHERMAN:  No objection.

3          THE COURT:  All right.  Government Exhibit No. 1 is

4   received in evidence.

5          (Government Exhibit 1 so marked.)

6          THE COURT:  Do you wish to play it just for the

7   witness?

8          MS. BELIZAIRE:  No, Your Honor.  Now that it's in

9   evidence, I'm going to play it for everyone.

10  Q    Before we get to the video, does that thumb drive also

11  contain a map that you have reviewed before coming to court

12  today?

13  A    Yes.

14  Q    And is that marked as Government Exhibit No. 6 for

15  identification?

16  A    Yes.

17  Q    Do you recall what location that map generally covers?

18  A    Jamaica, Queens, between 134th Avenue and 137th Avenue on

19  Guy R. Brewer Boulevard.

20  Q    Okay.  Is the intersection of Guy R. Brewer Boulevard and

21  137th Avenue and the surrounding area depicted on that map?

22  A    Yes.

23  Q    And does that map, Government Exhibit 6 for

24  identification, fairly and accurately depict the streets and

25  avenues as they appeared on February 14th of 2023?

1    A    Yes.

2          MS. BELIZAIRE:  Okay.  At this time I'll offer into

3    evidence Government Exhibit 6 as well.

4          THE COURT:  Has the defense seen Government

5    Exhibit 6?

6          MS. SHERMAN:  Yes, Your Honor.

7          THE COURT:  Any objection?

8          MS. SHERMAN:  No objection.

9          THE COURT:  All right.  Government Exhibit 6 is

10   received in evidence.

11         (Government Exhibit 6 so marked.)

12         MS. BELIZAIRE:  Thank you, Your Honor.

13         I have a digital, exact digital copy on my computer

14   for display and I'm going to pull up Government Exhibit No. 6,

15   and if that can be -- great.

16         THE COURT:  Is it on your screen, sir?

17         THE WITNESS:  Yes, Judge.

18         THE COURT:  Okay.  And does the defense see it?

19         MS. SHERMAN:  Yes, Your Honor.

20         THE COURT:  Okay.  Let's go.

21   Q    Detective Conte, can you please circle or indicate in

22   some way where the police precinct is.

23   A    (Witness complies.)

24         MS. BELIZAIRE:  Let me help you.

25         THE COURT:  That's fine.

1       MS. BELIZAIRE:  For the record, the witness put a
2  pink arrow right next to the icon that actually says "New York
3  Police Department 113th."
4       THE COURT:  That's pink?
5       MS. BELIZAIRE:  I'm seeing pink, Your Honor, or
6  fuchsia perhaps.
7       THE COURT:  Fuchsia?
8       MS. BELIZAIRE:  Fuchsia.
9       THE COURT:  Yes.
10 Q    Could you put, could you indicate -- could you now
11 indicate where the ARGUS camera is or the ARGUS camera that
12 you were viewing was located on February 14th of 2023.
13 A    (Witness complies.)
14      MS. BELIZAIRE:  For the record, the witness put
15 another fuchsia marker towards the bottom of the map,
16 indicating two icons.  One is Eli's Dominican Style Beauty
17 Salon, and on the southern part of it is Metropolitan
18 Laundromat and Wash.
19 Q    Can you indicate where the arrest happened that you
20 viewed?
21 A    (Witness complies.)
22      MS. BELIZAIRE:  For the record, the witness
23 indicated with a fuchsia triangle almost directly on top of
24 but just south of where the ARGUS camera was.
25      Okay.  Now turning back to Government Exhibit No. 1

1    and playing this for the witness.  I'm going to pause it right

2    at the beginning.  The time stamp at the bottom is 2:00:03

3    a.m.  The date is 2/14/23.

4              (Video stopped.)

5    Q    Detective Conte, what are we looking at here?

6    A    This is the deli and grocery that's on Guy R. Brewer

7    Boulevard in between 137th Avenue and 134th Avenue.

8              MS. BELIZAIRE:  Let me just clear the marks.  Okay.

9              (Video plays.)

10   Q    Is this the default position of that camera where there's

11   no manual control?

12   A    Yes, it is.

13   Q    What side of the street are we looking at?

14   A    This traffic that we're looking at is flowing southbound.

15   Q    Okay.  And so what side, what side of Guy R. Brewer

16   Boulevard would that be?

17   A    This would be the southwest side.

18   Q    And where is the camera located to the deli and grocery

19   we're looking at right now?

20   A    There is a utility pole that the camera is on, almost in

21   front of the deli.

22             MS. BELIZAIRE:  I'm going to fast forward now to

23   about 2:18:45.  I'll play it from 2:18:43 a.m.

24   Q    Detective Conte, can you just tell us when, in the video

25   that's playing, you manually took control?

1  A    Right now.

2          MS. BELIZAIRE:  And the time stamp is 2:18:54.

3          (Video continues to play.)

4  Q    How do you know you took control at that moment in time?

5  A    I'm using the toggle buttons to control it left to right,

6  zoom in, and zoom out.

7                    (Video stopped.)

8          MS. BELIZAIRE:  Okay.  I'm going to pause it right

9  here, at 2:19:12.

10 Q    Do you know who this individual is?

11 A    I do not.

12 Q    Okay.  Why did you zoom in on that individual?

13 A    I was attempting to identify him.

14 Q    Why?

15 A    If he's a potential witness or perpetrator on the street

16 in the future, I have the clothing he's wearing saved on the

17 ARGUS camera.

18 Q    Okay.  And is that something that's part of your normal

19 routine when you're viewing the ARGUS camera?

20 A    Yes.

21          MS. BELIZAIRE:  I'm going to let it continue to

22 play.

23          (Video plays.)

24 Q    And while it's playing, we continue to see the ARGUS

25 camera moving.

1        How is that happening?

2   A    I'm controlling it.

3   Q    Are you watching this contemporaneous with controlling

4   it?

5   A    Yes.

6            (Video stopped.)

7            MS. BELIZAIRE:  I'm going to pause it.  It's

8   2:19:44 a.m.

9   Q    Was there anything in this frame that's familiar to you?

10  A    The minivan.

11  Q    And how is that minivan familiar to you?

12  A    I have seen it once before on the ARGUS camera.

13           THE COURT:  On another date?

14           THE WITNESS:  Yes.

15           (Video played.)  (Video stopped.)

16  Q    Pausing it at 2:19:51, I'm sorry, 2:19:52a.m., what are

17  you doing here?

18  A    I was trying to read the front license, plate which I was

19  unable to.

20  Q    Did you make any notes about, notations in your head or

21  did you, were you mindful of what you did see here?

22  A    No.

23           (Video plays.)

24  Q    Okay.  Do you know what plate this state is associated

25  with this plate?

1   A    From looking at this video, I could tell it's yellow,

2   New York.

3           (Video stopped.)

4           MS. BELIZAIRE:  And I'm going to pause it again at

5   2:20 a.m.

6   Q    In what context was it familiar to you on the prior

7   occasion?

8   A    I've done surveillance, and I know this minivan is being

9   operated by SNOW gang members.

10          MS. BELIZAIRE:  I'm going to hit play.

11          (Video plays.)

12  Q    While it's playing, the camera is moving, are you

13  continuing to watch the ARGUS camera at this moment?

14  A    Yes.

15          (Video stopped.)

16          MS. BELIZAIRE:  I'm going to pause it at 2:21:08.

17  Q    At the time you were watching this, did you know the

18  individual in the driver seat?

19  A    No, I did not.

20  Q    However, did you come to learn who that was?

21  A    Yes.

22  Q    And who was that?

23  A    Robert Homer.

24  Q    The defendant?

25  A    Yes.

1    MS. BELIZAIRE:  I'm going to continue to play this

2 from 2:21:10 onward.

3        (Video plays.)

4 Q    At 2:21:16 what were you observing happening with the

5 minivan?

6 A    It was moving backwards.

7        (Video stopped.)

8        MS. BELIZAIRE:  I paused it at 2:21:55.

9 Q    What did you just observe in the seconds leading up to

10 where I paused it at 2:21:55?

11 A    The person driving the minivan just put a large black

12 handgun in their pants pocket.

13 Q    And did you observe that in realtime on February 14th of

14 2023?

15 A    Yes.

16        MS. BELIZAIRE:  Okay.  I'm going to rewind back to

17 2:21:37 and I'm going to hit play.

18        (Video played.)  (Video stopped.)

19        MS. BELIZAIRE:  And if I -- I paused it at 2:21:52.

20 Q    What did you do in response to seeing that?

21 A    I immediately got out of my seat and was going to arrest

22 this person in the street.  I walked over to get cop car keys,

23 and there was no supervisor in my office.  So then I couldn't

24 go arrest this person.

25        So I went back to my computer and then I thought

1  about who was in, and I knew the public safety team was

2  currently working.  So I've worked with Officer Lombardi in

3  the past on other things, and I called him on the phone and I

4  said there's a person driving a minivan and he has a big black

5  gun and he put it in his pants pocket.

6  Q    Okay.  And what unit is Officer Lombardi part -- what

7  particular unit is he a member of?

8  A    Public safety team.

9  Q    And what is the public safety team?

10 A    It's a street enforcement team, to make street arrests.

11 Q    Do they have specialized training?

12 A    Yes.

13 Q    And can you generally describe what that training is?

14 A    They receive unique training at the range and tactics

15 training.

16 Q    Have you ever received similar training, in your

17 experience?

18 A    Yes, I have.

19 Q    And did you give him a description of the individual who

20 you had seen with the gun?

21 A    I just told him a male who was operating a minivan.

22 Q    And did you give him a description of the van?

23 A    Yes.

24 Q    What did he say back to you?

25 A    He said we're in the precinct and we're going there right

1  now.

2  Q    Do you know what phone you used to call him on?

3  A    I do not.

4  Q    Okay.  Did you perceive this to be a dangerous situation?

5  A    Yes, very.

6  Q    Why?

7  A    There is a person armed with a handgun on the street.

8  Q    What about the area was noteworthy to you?

9  A    That area has a lot of shootings and it's a high-crime

10 area.

11 Q    What, if anything, did you note about who was in the

12 vehicle?

13 A    I noticed that there was a female in the vehicle also.

14 Q    And what, if anything, did you note about the manner in

15 which the gun was being safeguarded, if at all?

16 A    He had no firearm discipline.  He took the gun out and

17 put it in his pants pocket.

18 Q    How long did you stay on the phone with Officer Lombardi?

19 A    Until he arrived on scene.

20 Q    And do you know how he got to the arrest location?

21 A    Police car.

22 Q    Approximately how long does it take to get by car from

23 the precinct to this arrest location?

24 A    You could drive a police car from the precinct to the

25 arrest location in 45 seconds.

1   Q   Can you describe for us what you're saying to him while

2   you're on the phone with him while he's en route to the

3   location?

4   A   I'm telling him what the driver is doing and what was

5   going on on the video.

6           MS. BELIZAIRE:  Okay.  I'm going to now hit play

7   again.  It had been paused at 2:21:52.

8           (Video plays.)

9   Q   And can you narrate for us, as the video is playing, in

10  generalities what you're saying to Officer Lombardi?

11  A   At this time, I told him this person had a gun in their

12  pocket.

13  Q   And what are you doing while you're on the phone with

14  him?

15  A   I'm telling him to get there before this person leaves,

16  and then he exits the van.

17  Q   The time is 2:22:25.

18          Are you saying the defendant exited the van at that

19  point?

20  A   Yes.

21  Q   Are you still observing the ARGUS camera while this is

22  going on?

23  A   Yes.

24  Q   The video is playing.  It's 2:23:01.

25          What are you saying to Officer Lombardi at about

1  this time?

2  A    I told him he's out of the car and at the deli.

3  Q    And why are you moving the camera and focusing in at

4  2:23:42?

5  A    I'm just seeing what's around and where he's going.

6  Q    And what are you thinking at this point?

7  A    I'm thinking that Officer Lombardi has to get there

8  quickly.

9             MS. SHERMAN:  Objection.

10            (Video stopped.)

11            MS. BELIZAIRE:  Your Honor, I believe there was an

12  objection.

13            THE COURT:  I'm sorry.  There was an objection?

14            MS. SHERMAN:  Yes.  Objection in terms of relevance

15  of what he was thinking.

16            THE COURT:  Overruled.

17            MS. BELIZAIRE:  I'm going to continue playing.  The

18  time is 2:24:37 a.m.

19            (Video plays.)

20  Q    What are you observing in realtime on February 14, 2023

21  happening at this time?

22  A    This person went behind the wheel of the minivan.

23  Q    And what if anything -- it's 2:24:57.

24            Where is the defendant now?

25  A    He's seated behind the wheel of the minivan.

1  Q    And what is the position of the driver's side door?

2  A    It just closed.

3  Q    What, if anything, are you narrating, in generalities, to

4  Officer Lombardi at this point?

5  A    I said the person with the gun is back inside the

6  minivan.

7  Q    And what are you thinking at this point?

8  A    For him to get there before the minivan pulls away.

9  Q    It's 2:25:24.  We see the camera moving.

10        How is the camera moving?

11 A    I'm moving it.

12        (Video stopped.)

13        MS. BELIZAIRE:  We'll pause it at 2:25:47 a.m.

14 Q    What do you see in this frame?

15 A    A police car pulled behind the minivan.

16 Q    Okay.  And did you see this in realtime on that day?

17 A    Yes.

18        (Video plays.)

19 Q    Do you know who's inside that police vehicle?

20 A    Officer Lombardi.

21 Q    Are you still on the phone with him at about this time?

22 A    Yes.

23 Q    Okay.  When does the phone call end?

24 A    As he's approaching the van.

25 Q    Okay.  And did you confirm with him that he was

 1  approaching the vehicle that had the defendant with the gun?

 2  A    Yes.

 3          (Video stopped.)

 4  Q    It's now 2:25:50 a.m.

 5          Who do we see -- well, do you recognize anyone in

 6  this frame?

 7  A    Yes.

 8  Q    Who do you recognize?

 9  A    The first officer closest to the van on the driver's side

10  of the van is Officer Lombardi.

11  Q    And who is behind him in the frame?

12  A    That's a little hard to see.

13          MS. BELIZAIRE:  I'll keep playing.

14          (Video played.)  (Video stopped.)

15          MS. BELIZAIRE:  I'll pause it now.  It's 2:25:56.

16  Q    Can you tell who is behind him at this point?

17  A    Yes.  That's Officer Tessa Piteo.

18  Q    And can you tell who is on the passenger side?

19  A    Yes.  That's Officer Christopher Colello.

20          MS. BELIZAIRE:  I'll let this play.

21          (Video played.)  (Video stopped.)

22          MS. BELIZAIRE:  Okay.  I paused it at 2:26:17.

23  Q    What, if anything, did you note was in Officer Lombardi's

24  hand at this point?

25  A    A gun.

1  Q    From the time the police officers approached the vehicle

2  until the time you stopped watching this, were you watching it

3  continuously and live as it's happening?

4  A    Yes.

5            (Video played.)  (Video stopped.)

6  Q    I paused it at 2:26:49.

7            Do you recognize an additional officer in this

8  frame?

9  A    Yes.

10 Q    Who do you recognize?

11 A    That's Sergeant Barreto.

12 Q    And what does it appear that he is doing in this frame,

13 at 2:26:49 a.m.?

14 A    Pointing at the NYPD ARGUS camera.

15 Q    Okay.  I'm now going to fast forward to about 2:37 a.m.

16           (Video plays.)

17 Q    What do you observe happening there?

18 A    An officer is driving the minivan.

19 Q    Okay.  With the police vehicle also leaving the scene?

20 A    Yes.

21           (Video stopped.)

22 Q    Okay.  Now, did you have an opportunity to interact with

23 the defendant in the precinct?

24 A    Yes, I did.

25 Q    Can you describe those interactions?

1  A    He did not want -- ask for an attorney.  He did not want

2  to discuss the firearms in the case.  I asked him about

3  related events involving the SNOW gang and anyone of his

4  friends being hurt.

5  Q    What did he say about that?

6  A    He didn't want to talk about anything.

7  Q    Did your interactions with him end at that point?

8  A    Yes.

9  Q    Once back at the precinct, did you review more video

10 associated with the arrest of the defendant?

11 A    Yes.

12 Q    And what did you review?

13 A    Body-worn camera.

14 Q    What is body-worn camera?

15 A    Body-worn camera is made by Axon, and it's an NYPD

16 application that I can review.  It's an investigative tool.

17 Q    And what is like the physical component of the body-worn

18 camera?

19 A    The body cam is magnetized to your chest, to your vest,

20 and you press a button in the middle.  When you press that

21 button, audio and video are recorded and it's recorded a

22 minute prior with no audio.

23 Q    And so how do you activate the body camera?

24 A    You depress a button in the middle of the camera.

25        MS. BELIZAIRE:  And just for the record, the witness

1   is pointing directly in the middle of his chest.

2   Q    Does it record?

3   A    Yes, it does.

4   Q    And do, as a detective, do you have access to the

5   body-worn camera?

6   A    Yes, I do.

7   Q    Is body-worn camera made in the ordinary course of NYPD

8   business?

9   A    Yes, it is.

10  Q    Is it the ordinary course of NYPD business to make and

11  keep body-worn camera?

12  A    Yes.

13  Q    Is it made -- are the recordings made on the body-worn

14  camera made at or about the time of the events depicted in the

15  video?

16  A    Yes.

17  Q    And is NYPD under a business duty to maintain and keep

18  those records accurately?

19  A    Yes.

20  Q    I'm going to show you what has been marked -- I guess at

21  this point just for the witness, please -- as Government

22  Exhibit No. 3.  Okay.

23        Do you recognize this?

24  A    It's not playing on my screen.

25        THE COURT:  Hold on.  Okay.

1  Q    Can you see it now?

2  A    No.

3  Q    Can you let me know when you see it, if you do?

4        THE COURT:  We have it shown on our presentation

5  system.

6        MS. BELIZAIRE:  Well, I can probably set the

7  foundation.

8  Q    Did you view Government Exhibit No. 3, which is the

9  body-worn camera, prior to coming to court?

10  A    Yes, I did.

11  Q    Is that also on the thumb drive that's before you that

12  you signed and dated?

13  A    Yes.

14  Q    And is the body-worn camera in Government Exhibit No. 3

15  for identification a fair and accurate depiction of the

16  body-worn camera you reviewed back at the precinct, related to

17  this arrest?

18  A    Yes.

19  Q    And is it also a fair and accurate depiction of what you

20  observed happening via the ARGUS camera on February 14, 2023?

21  A    Yes.

22        MS. BELIZAIRE:  Okay.  At this time, I offer

23  Government Exhibit No. 3 into evidence.

24        MS. SHERMAN:  No objection.

25        THE COURT:  All right.  Government Exhibit No. 3 is

1    received in evidence.

2              (Government Exhibit 3 so marked.)

3              MS. BELIZAIRE:  And I'll have it shown to everyone.

4              THE COURT:  I'm not sure why it's not coming up.

5              MS. BELIZAIRE:  What would you like me to do,

6    Your Honor?

7              THE COURT:  Well, I have it listed here as being

8    available.  So there's something wrong with the connection.

9              MS. BELIZAIRE:  Would you like me to try moving to

10   that computer?

11             THE COURT:  Yes.  Give it a try.  The other video

12   came through fine.

13             MS. BELIZAIRE:  Maybe I'll just replug it in and see

14   if that works.

15             THE COURT:  This is on the laptop lectern.

16             MS. BELIZAIRE:  Yes, the lectern.

17             (Pause.)

18             MS. BELIZAIRE:  Let me see if it works from the

19   table.

20             THE COURT:  All right.  Thank you.

21             MS. BELIZAIRE:  Yes, Your Honor.

22             THE COURT:  There it goes.

23             MS. BELIZAIRE:  Okay.  I'm hitting play.  The time

24   stamp at the top is 2:24:49 a.m., when the video is started.

25             (Video plays.)

1          THE COURT:  You can sit and do this if it is better.

2          MS. BELIZAIRE:  Thank you, Your Honor.

3   Q     And as this is playing, it's about 18 seconds in, what

4   are we looking at?

5   A     This is Officer Lombardi's body camera, arriving to the

6   incident location.

7          THE COURT:  And how do you know it's his?

8          THE WITNESS:  Because I reviewed it.

9   Q     Is there also some audio that will happen in a moment,

10  that you heard in connection with this video?

11  A     Yes.

12         (Video stopped.)

13         MS. BELIZAIRE:  I'm going to pause it for a moment.

14  The time stamp is 2:25:41.  At the bottom, it's about

15  51 seconds into the video.

16  Q     There's going to be some audio in a moment, and I'd like

17  to ask you if you could listen carefully and let us know what

18  you hear.

19         (Video plays.)  (Video stopped.)

20         MS. BELIZAIRE:  There's supposed to be some audio.

21  Let me unmute my computer.  I'm now playing it from the time

22  stamp 2:25:43.

23         (Video plays.)

24         MS. BELIZAIRE:  I'm going to back it up.  2:58.

25         (Video played.)  (Video stopped.)

1  Q    Did you hear something right at the beginning of the

2  recording?

3  A    Yes.

4  Q    What did you hear?

5  A    "All right.  Bye."

6  Q    And who was -- what was that?

7  A    I believe that's my voice.

8  Q    And what is your understanding of what is happening in

9  that moment?

10  A    Officer Lombardi is about to approach the minivan.

11  Q    Okay.  Is the phone conversation you've been discussing

12  in your testimony ending at that point?

13  A    Yes.

14            (Video played.)  (Video stopped.)

15  Q    I paused it at 1:14.  What are we observing at that

16  point?  Sorry.  The time stamp in the video is 2:26:01.  The

17  marker at the bottom is a minute and 14.

18            What do we see happening at that moment?

19  A    Robert Homer is on his back, and Officer Lombardi is

20  disarming Robert Homer.

21  Q    Where was the gun retrieved from, by Officer Lombardi?

22  A    His right pants pocket.

23            (Video played.)  (Video stopped.)

24  Q    I'm paused at 2:26:36, the time stamp on the video.

25            What did we just witness happening?

1   A    Officer Lombardi removed the gun from his pocket, and

2   Robert Homer is saying they planted a gun on me.

3   Q    What is Officer Lombardi doing with the gun while he's

4   approaching the car once he gets to the vehicle that's

5   depicted in this frame?

6   A    He's making the gun safe by making sure there's no

7   bullets in the gun.

8   Q    How does he do that?

9   A    He takes the firearm, drops the magazine, takes the top

10  of the gun, and racks the top to see if there's any bullets in

11  the gun.

12          MS. BELIZAIRE:  I'm going to let this continue to

13  play.

14          (Video played.)  (Video stopped.)

15          MS. BELIZAIRE:  One moment, Your Honor.

16          (Pause.)

17          MS. BELIZAIRE:  I have no further questions of this

18  witness.

19          I did want to just make the record clear.  I'm not

20  sure if I offered into evidence Government Exhibit No. 6,

21  which was the map.  So I'm offering it at this time.

22          THE COURT:  Yes, you did.

23          MS. BELIZAIRE:  Thank you, Your Honor.  No further

24  questions.

25          THE COURT:  All right.  Cross-examination.

1  CROSS-EXAMINATION.

2  BY MS. SHERMAN:

3  Q    Good morning, Detective.

4  A    Good morning.

5  Q    So as we just saw, you're not the arresting officer in

6  this case, correct?

7  A    I'm not.

8  Q    So you didn't grab Mr. Homer out of the car, right?

9  A    I did not.

10 Q    And you didn't recover a gun from Mr. Homer?

11 A    I did not.

12 Q    You weren't present at the scene at 134-50 Guy R. Brewer

13 Boulevard on February 14th, correct?

14 A    I was not.

15 Q    And you stayed at the 113th Precinct for the entirety of

16 your shift, correct?

17 A    Yes.

18 Q    We heard a lot about your training and experience on

19 direct.

20         As part of a, as part of your role as a detective

21 with the shooting squad, you used various tools to investigate

22 cases, correct?

23 A    Yes.

24 Q    So you do social media searches, for example?

25 A    Yes.

1  Q    And you use confidential informants, correct?

2  A    Yes.

3  Q    So if you get a tip or a lead, you use that to

4  investigate a case further, correct?

5  A    Yes.

6  Q    In this case, you didn't have a tip from a confidential

7  informant that Mr. Homer was in possession of a firearm, did

8  you?

9  A    I did not.

10 Q    And you didn't see any photo or video on social media of

11 Mr. Homer possessing a firearm on February 14th, correct?

12 A    I did not.

13 Q    So the investigative tool that you used in this case was

14 watching this live footage of the ARGUS camera, correct?

15 A    Yes.

16 Q    Now, on direct, you testified that you daily watch live

17 ARGUS footage, right?

18 A    Yes.

19 Q    Okay.  And I think you said you daily watched this

20 specific camera.

21 A    So I watch 134 to 137 every day.  This camera

22 specifically on this pole is broken now.  So I moved to the

23 camera northbound, which covers the same area.

24 Q    Okay.  When you do this every day, how long are you

25 watching this for?

1  A    It depends what my daily activities are.  It could be 20

2  minutes, it could be hours.  It depends what's on the camera

3  and what's going on.

4  Q    Okay.  How about on this day, when did you start looking

5  at that footage?

6  A    When I toggled the camera, that's when I began looking at

7  this.  I don't remember when I looked at it before, but I

8  periodically look at it throughout the day.

9  Q    Okay.  So to be clear, you first started watching this

10  live footage at the time you started toggling the camera, at

11  around 2:18 a.m.?

12  A    So at my desk, I have two screens.  One screen I'll read

13  case work and do functions of my squad; and then on the other

14  screen, I'll have cameras up in the command on ARGUS.  So I

15  glance over at the ARGUS and then do case work at the same

16  time.

17  Q    Okay.  But in this specific case, what your testimony is

18  is that you started looking at that camera on that day at

19  about, I guess we looked at 2:18 a.m., correct?

20  A    Yes.

21  Q    When you zoom in on the man in the black hooded

22  sweatshirt and the vest.

23  A    Yes.

24  Q    Okay.  And you, as you just testified, you didn't have a

25  tip, you didn't have anything else; you just at that moment

1  decided to look at the camera.

2  A     Yes.

3  Q     So you testified on direct that you can watch live

4  footage and also that the ARGUS camera records, right?

5  A     Yes.

6  Q     Okay.  So if you're watching footage live and, as we saw,

7  you can manipulate the camera, correct?

8  A     Yes.

9  Q     So you can move it around, right?

10 A     Yes.

11 Q     And zoom in, correct?

12 A     Yes.

13 Q     All right.  So if you're manipulating the camera, let's

14 say zooming in, and the ARGUS camera is recording, it's going

15 to record that you're zooming in, correct?

16 A     Yes.

17 Q     Okay.  So what we just saw is a recording of everything

18 that you were doing with the camera?

19 A     Yes.

20 Q     Okay.  And while you're watching live footage and you are

21 able to sort of take control of the camera, are you able to

22 rewind, for example?

23 A     You'd have to stop watching live and then go into a

24 rewind function.  You can't watch live and rewind at the same

25 time.

1  Q    Okay.

2          THE COURT:  So you would miss anything at the period

3  of rewinding, you would lose any live activity at that point?

4          THE WITNESS:  No.  So I'm the detective and if

5  there's an NYPD detective next to me, I can rewind on my

6  computer while another detective is continuing to watch live.

7  So if I start rewinding, I don't lose live video.

8          THE COURT:  So it can record the live video while

9  you rewind to look at something that's already happened?

10          THE WITNESS:  Yes.

11          THE COURT:  All right.  Go ahead, please.  Any

12  follow up on that question?  You look --

13          MS. SHERMAN:  I was thinking about it.

14          THE COURT:  Okay.  That's fine.

15  Q    So I guess my question on that is if you -- so you just

16  testified that the camera is recording what you're doing when

17  the, with the ARGUS camera, correct?

18  A    Yes.

19  Q    Okay.  But if you rewind, it wouldn't record that; it

20  would still keep recording live?

21  A    It still records.

22  Q    But it wouldn't document that had you rewound the video?

23  A    I'm not sure.

24  Q    Okay.  So at around 2, I guess 18 a.m. on February 14th,

25  you are watching, you decided to watch the footage at this

1  point; and this is at your desk?

2  A    Yes.

3  Q    And did you say there's another detective there with you?

4  A    Yes.

5  Q    Okay.  Who was that?

6  A    Officer Desilva.

7  Q    Okay.  And so the both of you were there.

8         And where is this, where is your desk in relation to

9  where other officers would be in the precinct, I think

10 specifically, the neighborhood safety officers I think you

11 referred to?

12 A    Public safety.

13 Q    Public safety.

14 A    I'm on the second floor in the front of the building.

15 Q    Okay.

16 A    I was, at this time I wasn't assigned this specific desk,

17 but I remember what desk I was sitting at.

18 Q    Okay.  Where is that in relation to where the public

19 safety officers are in the precinct?

20 A    It's across the hall.

21 Q    On the same floor?

22 A    Yes.

23 Q    Is it like, is it a room you're in and they're in a

24 separate room, or is it one open space?

25 A    I'm in one room, there's a door, the hallway, and they're

1  in another room.

2  Q    Okay.  So just one follow-up on that for a second.

3        You testified on direct that when you saw, and we'll

4  go to this at another point, but when you saw what you

5  believed to be a firearm with the driver of the van with what

6  you appeared to be a firearm, that you got up from your desk

7  and went to go make the arrest yourself.  Correct?

8  A    Yes.

9  Q    Okay.  And then you said you didn't have a supervisor.

10       So you couldn't actually make the arrest, right?

11 A    Yes.

12 Q    And you thought to yourself who is here and who can make

13 that arrest, correct?

14 A    Yes.

15 Q    And you testified that that was the neighborhood or the

16 public safety officers, that you knew that they were in the

17 precinct, right?

18 A    Yes.

19 Q    And there, as you said, they're across the hall from you,

20 correct?

21 A    Yes.

22 Q    Okay.  But you testified that you decided to call

23 specifically Officer Lombardi.

24 A    Yes.

25 Q    Okay.  So you didn't go across the hall to see who was

1  there, right?

2  A    I did not.

3  Q    Okay.  But you had already gotten up from your desk.

4  A    So I stayed in the detective squad.  I got up from my

5  desk.

6  Q    Right.

7  A    The police car keys are in the supervisor's office.

8  Q    Okay.

9  A    I went to go look for keys, and I looked for a boss and I

10  saw there was no boss and then I was like what do I do.  Then

11  I said let me call public safety because they're in and

12  they're working.

13  Q    Right.  Okay.  So you made the decision to call as

14  opposed to just walk across the hall?

15  A    I didn't know where they were.  I didn't know if they

16  were in the street or if they were in their office.  So that's

17  why I called.

18  Q    Oh, I thought you said that you knew that they were in.

19  A    In, like working in.

20  Q    Got it.

21          THE COURT:  They were in, they were on duty?

22          THE WITNESS:  Yes.

23          THE COURT:  On duty.

24  Q    Okay.  And you knew that Officer Lombardi specifically

25  was on duty?

1   A    I knew he was on the team.

2   Q    But did you know that he was on duty?

3   A    I'm not sure.  I just know he's on that team and works

4   those hours.

5   Q    Okay.

6   A    I didn't know if he was on vacation or I don't know his

7   schedule.

8   Q    Okay.  So you see what you believe to be a firearm, you

9   realize you can't make the arrest yourself, and so you decide

10  to call Officer Lombardi, not knowing if he's working, if he's

11  in the field, if he's in the precinct, you don't know where he

12  is but you decide to call him specifically.

13  A    Yes.

14  Q    Okay.  And you said that was because you've worked with

15  Officer Lombardi before.

16  A    We were never on the same team but we're in the same

17  precinct, and I've worked hand in hand with him before.

18  Q    Okay.  And when you were in the precinct that day, had

19  you seen any of the other public safety officers in the

20  building?

21  A    I don't remember.

22  Q    Okay.  And when we watched the video, you said you

23  recognized Officer, I think it was Pee-et-to?

24  A    It's actually Piteo.

25  Q    Piteo?  Can you say it again?

1    A      Piteo.

2    Q      Piteo.  You recognized her and you recognized

3    Officer Colello, correct?

4    A      Yes.

5    Q      And Sergeant Barreto, right?

6    A      Yes.

7    Q      Okay.  And so you're aware all of those officers are with

8    the public safety team, correct?

9    A      Yes.

10   Q      Okay.  And you don't remember if you had seen any of them

11   in the precinct that night, correct?

12   A      I don't remember if I saw them in passing.  I'm not sure.

13            MS. SHERMAN:  Okay.  Let me come back to this, but

14   I'll move forward for a minute.

15            Okay.  I want to look at, if we can pull up, if we

16   can pull up Government Exhibit 1, please.  Thank you.

17   Q      I'd like to go to the moment when you say you start sort

18   of looking or watching the footage, which I believe is about

19   2:19 a.m.

20   A      Excuse me.  My screen is not working.

21            THE COURT:  Here we go.  Got it?

22            THE WITNESS:  Got it, Judge.  Thank you.

23            THE COURT:  Thank you.

24            MS. SHERMAN:  Okay.  So if we can just press play

25   and pause at about 2:19:09.

1          (Video played.)  (Video stopped.)

2   Q    Okay.  So this is the moment you said that you, that you

3   are watching the footage live?

4   A    Yes.

5   Q    Okay.  And I think you testified on direct that you

6   zoomed in on this person because you wanted to document what

7   they were wearing in case they were a witness or a perpetrator

8   to a crime.

9   A    I zoomed in on this person, I looked at their face.  I

10  didn't know who they were.  Then I zoomed out to see what they

11  were wearing head to toe, in case there's an incident that

12  happens in the future, this person is recorded on video.  So

13  if there's a shooting here, I can go back in days and have

14  this person.

15  Q    Okay.  But -- okay.  How about the person to the left?

16          MS. SHERMAN:  Well, actually, can we press play and

17  just go another couple of milliseconds.

18          (Video plays.)

19          MS. SHERMAN:  And pause, please.  Okay.

20          (Video stopped.)

21  Q    So you're focused in on this person, correct?

22  A    Yes.

23  Q    Okay.  And there was obviously someone to the left of

24  that person, and you don't zoom in on that person, right?

25  A    I do not.

1  Q    Okay.  But your testimony is you don't know who this is,
2  you had no reason or indication to think that they were
3  engaged in any criminal activity, correct?
4  A    Yes.
5         MS. SHERMAN:  Okay.  Okay.  If we can press play
6  again.
7         (Video plays.)
8         MS. SHERMAN:  Okay.  If we can press pause for a
9  second.
10         (Video stopped.)
11  Q    You testified on direct that you recognized this van
12  because you had seen it on surveillance video before, correct?
13  A    Yes.
14  Q    Okay.  Had you pulled over this van before?
15  A    No.
16  Q    Have you ever pulled over this van with Mr. Homer driving
17  it?
18  A    No.
19  Q    Okay.  So you testified that you can't read the license
20  plate number.  Correct?
21  A    Yes.
22  Q    Okay.  And what you see is a silver van, you don't know
23  the license plate number, and you, your testimony is you've
24  seen it once before, correct?
25  A    Yes, on the ARGUS video.

1    Q    Right.  But you recognize this van as a van you've seen
2    before without being able to see the license plate, correct?
3    A    Yes.
4    Q    Okay.  And, again, that's just from one time seeing it on
5    surveillance footage at some point, correct?
6    A    Yes.
7    Q    And your testimony on direct is that you knew this van
8    was operated by members of the SNOW gang, correct?
9    A    Yes.
10   Q    Okay.  But, again, you don't know what the license plate
11   number is, and this is just a silver van you've seen once
12   before, right?
13   A    Yes.
14        MS. SHERMAN:  Okay.  You can keep pressing play.
15        (Video plays.)
16   Q    Okay.  So at this point, -- and we can keep letting it
17   play.
18        At this point, you focused in on the driver's side,
19   the driver's seat of this van, right?
20   A    Yes.
21   Q    Okay.  And you're zoomed in, right?
22   A    Yes.
23   Q    Okay.  Still trying to figure out what the license plate
24   is, right?
25   A    Yes.

1       MS. SHERMAN:  If we can pause for a second.

2       (Video stopped.)

3    Q    And we'll jump ahead in a second, but you are, you focus

4    in on the driver's side of this van starting at about, I think

5    we started at about 2:19:38, and you focus in on that the

6    entire time until you see what you believe to be a firearm,

7    right?

8    A    Yes.

9       MS. SHERMAN:  So if we can go to approximately

10   2:21:40 and just, don't play it yet but if we can get there.

11   Q    While you're watching this car, you see that there is

12   someone in the front passenger seat, right?

13   A    Yes.

14   Q    And someone in the back seat, right?

15   A    Yes.

16   Q    Okay.  So two other people in the car, right?

17   A    Yes.

18   Q    Okay.  And you're focused in on the driver's side, right?

19   A    Yes.

20   Q    So you aren't zooming in to see the face of the person in

21   the back, correct?

22   A    I couldn't.  It was blocked.

23   Q    Okay.  But you're not attempting to do that, correct?

24   A    No.

25   Q    Or the person in the front passenger seat, correct?

1   A    No.

2   Q    Okay.  And, in fact, the person in the back passenger

3   seat was the same person that was next to the man in the black

4   puffy jacket, right?

5   A    I'm not sure.

6   Q    Okay.  We can watch it later; but you went for the full,

7   it looks like it's about two minutes, you are staring

8   exclusively at the front passenger seat of this car, right?

9   A    The front driver's seat.

10  Q    Front driver's seat.  I apologize.  Right?

11  A    Yes.

12  Q    Okay.  And until this moment, you did not see Mr. Homer

13  doing anything suspicious, correct?

14  A    I just saw him behind the wheel of the van.

15  Q    So you did not see him doing any suspicious, correct?

16  A    Yes.

17  Q    And you didn't see him doing anything indicative of

18  criminality, correct?

19  A    I did not.

20  Q    Okay.  And your testimony on direct was that you had

21  never seen him before, right?

22  A    I never have.

23  Q    Okay.  And so, much like the person that you focused in

24  on before, with the puffy vest, you wanted to see if you

25  recognized them, correct?

1  A    Yes.

2  Q    And then, I guess, document what they're wearing in case

3  they're a witness or a perpetrator later on.

4  A    I attempted to identify him, and I didn't know who he

5  was.

6  Q    Okay.  And you kept watching for two minutes, right?

7  A    Yes.

8  Q    Okay.  With no reason to suspect he was doing anything

9  criminal, correct?

10  A    Yes.

11      MS. SHERMAN:  Okay.  So if we can press play.

12      (Video plays.)

13      MS. SHERMAN:  Okay.  Press pause.

14      (Video stopped.)

15  Q    This is the moment you say you observed what you believe

16  to be a large black firearm, correct?

17  A    Yes.

18  Q    Okay.  Okay.  And this is the first moment that you've

19  observed Mr. Homer do anything that you think is suspicious or

20  indicative of criminality or believe, have any reason to

21  believe he was armed, correct?

22  A    He was in possession of a firearm.

23  Q    He was in possession of what you believed to be a firearm

24  at that moment, correct?

25  A    Yes.

1   Q    But I'm saying that was the first time that you saw

2   anything that you believed he was doing that was suspicious or

3   criminal, correct?

4   A    Yes.

5   Q    Okay.  Now, I want to go back briefly to the issue of

6   notifying or calling Officer Lombardi.

7           You said you called him, but you didn't remember

8   what phone you used, correct?

9   A    Yes.

10  Q    Okay.  What number did you call him on?

11  A    I don't know what phone I used.  My cell phone service in

12  my office is not good.

13          So I don't know if I called from my personal phone,

14  work phone, or job phone.  I know I called him and told him

15  this person had a gun.

16  Q    Right.  And what number did you call him on, I'm saying.

17          What number did you call?  I'm not asking for the

18  digits but what did you, his personal phone, his cell phone,

19  what number did you call?

20  A    I don't remember what number I called.

21  Q    Okay.  You said you had worked with Officer Lombardi in

22  the past, correct?

23  A    Never on the same team but in the same building.

24  Q    Okay.  So you weren't partners.

25  A    No.

1  Q    Right?  And you wouldn't have his number memorized,

2  right?

3  A    No, I don't.

4  Q    Okay.  So you don't know what number, what phone you

5  used, correct?  It sounds like you have access to three.

6  A    Why he.

7  Q    Okay.  One is your personal cell?

8  A    Yes.

9  Q    One is your work cell?

10  A    Yes.

11  Q    And one is your work phone, you said.

12       So is that like a land line?

13  A    Yes.

14  Q    Okay.  And Officer Lombardi's phone number, whichever one

15  it is you're calling, would that be stored in your personal

16  cell phone?

17  A    I can access his work number on the computer, and his

18  personal cell phone is stored in my personal phone.

19  Q    Okay.  Did you access his number on the computer?

20  A    I don't remember what I used to get his phone number.  I

21  just remember I had his number and I called him.  I don't know

22  if I opened my personal phone, got his number and called him

23  off the land line, I don't know if I called -- I was in a

24  panic to call him about this person.

25  Q    No, I understand that.  I guess what I'm not

1  understanding is why Officer Lombardi specifically.

2  A    I think his training and tactics on the team is the best.

3  So that's why I called him.

4  Q    Okay.  But, again, you didn't know that he was actually

5  working that night.

6  A    I did not.

7  Q    But you were in a panic, right?

8  A    Yes.

9  Q    And you didn't access the radio, correct?

10  A    I did not.

11  Q    Okay.  There was no alert that went out to any officers

12  that were on patrol, correct?

13  A    No.

14  Q    Okay.  And you didn't reach out to a sergeant or, like

15  Sergeant Barreto, for example?

16  A    No.

17       THE COURT:  Can I just ask?  You said that you

18  looked around the precinct for the supervisor because you were

19  planning to go out and make an arrest yourself?

20       THE WITNESS:  Yes.

21       THE COURT:  Do you have to have a supervisor with

22  you on the scene of an arrest in order to make an arrest?

23       THE WITNESS:  Normally, yes, or you'd call the

24  supervisor over to verify.  So it was just me and another

25  officer in the detective squad, no supervisor or, I would

1  never go in the street to make an arrest like this without my

2  supervisor, one of my sergeants or lieutenants with me or

3  working.

4          THE COURT:  Okay.  Thank you.

5  Q    Okay.  So then your testimony was that you communicated

6  to Officer Lombardi that there was a man in a silver van with

7  a large black gun, correct?

8  A    Yes.

9  Q    Okay.  And obviously you didn't know the license plate

10 number.

11         So you didn't give that to him, correct?

12 A    Yes.

13 Q    And that was, you were asked several times on direct what

14 information and description you gave, and that was the

15 information you gave, correct?

16 A    Yes.

17 Q    Okay.  And you testified that you stayed on the phone

18 with Officer Lombardi the entire time.  Right?

19 A    Yes.

20         MS. SHERMAN:  Okay.  I want to pull up, we're still

21 on Government 1.  Can we go to 2:25:40 and pause at 2:25:48.

22         (Video plays.)

23         MS. SHERMAN:  Here we'll pause.

24         (Video stopped.)

25 Q    So you testified you're watching this live, right?

1    A    Yes.

2    Q    And that this is the moment that we see the police arrive

3    on scene, correct?

4    A    Yes.

5    Q    Your testimony is you're still on the phone with Officer

6    Lombardi at this point.

7    A    As he's getting -- I don't know when he hung up or where

8    he was, but as he got into the car, that's when we hung up.

9              THE COURT:  When he got to the silver car?

10             THE WITNESS:  Yes.

11             THE COURT:  Go ahead.

12             MS. SHERMAN:  Okay.  So if we can hit play again.

13   Actually, I'm sorry.  Can you pause for one second.

14             (Video played.)   (Video stopped.)

15   Q    So at the time stamp we're looking at, where we paused

16   before, was about 2:25:48.

17             So it's about four minutes from the time that you

18   observed Mr. Homer with what you believe to be a firearm.

19   Correct?

20   A    Yes.

21             MS. SHERMAN:  Okay.  We can press play.

22             (Video plays.)

23   Q    So Officer Lombardi opens the door, right, and pulls

24   Mr. Homer out of the car and onto the ground, correct?

25   A    Yes.

1  Q    And I believe --
2           MS. SHERMAN:  You can press pause for a second.
3           (Video stopped.)
4  Q    I believe you said it was Officer Colello on the other
5  side.
6  A    Colello.
7  Q    His gun is drawn, right?
8  A    Yes.
9  Q    And Officer -- I'll say it wrong again -- Piteo?
10 A    Yes.
11 Q    Piteo is with Officer Lombardi, correct?
12 A    Yes.
13 Q    And she's assisting in pulling him out of the car and
14 putting Mr. Homer on the ground, correct?
15 A    Yes.
16 Q    Okay.  So I want to go to Government Exhibit 3.  Okay.
17         So you testified on direct that, you testified how a
18 body camera works, right?
19 A    Yes.
20 Q    You've worn one, correct?
21 A    Yes.
22 Q    And you testified that when an officer activates their
23 body camera, it records a minute before they've actually hit
24 that activation period, correct?
25 A    Yes, with no audio.

1    Q    With no audio, right.

2         So the first minute that has no audio, that is a

3    minute before the officers actually activated their body-worn

4    camera, correct?

5    A    Yes.

6    Q    And that's the individual officer's decision as to when

7    to activate their body camera, correct?

8    A    Yes.

9    Q    Okay.  And in situations where you're responding to a

10   crime in progress, that's one of the situations where you're

11   required to activate your body camera, right?

12   A    Yes.

13   Q    And obviously your testimony is that you informed Officer

14   Lombardi several minutes prior that there was a crime in

15   progress, correct?

16   A    Yes.

17        MS. SHERMAN:  Okay.  Okay.  I'd like to hit play and

18   watch the, until about a minute or -- no, just hit play and

19   then I'll let you know when to hit pause.

20        (Video plays.)

21   Q    So we're watching his body camera and this is, you're

22   saying you're on the phone with him at this point, correct?

23   A    Yes.

24   Q    Okay.  Obviously that's, it would have to be a cell

25   phone, right, since he's in a car?

1  A    Yes.

2          MS. SHERMAN:  Can you press pause?  Can you back up

3  one.  I think it was like 40.  Yes.  Just a little bit back.

4          (Video played.)  (Video stopped.)

5  Q    Okay.  So we see this is Officer Lombardi's hand, right?

6  A    Yes.

7  Q    Obviously there's no cell phone in it, correct?

8  A    There is not.

9          MS. SHERMAN:  Okay.  Can we press play.

10         (Video plays.)

11         MS. SHERMAN:  Okay.  Can you press pause.

12         (Video stopped.)

13 Q    Your testimony is that you hear yourself say, okay, bye,

14 in that second?

15 A    Yes, I believe it's me.

16 Q    Based on recognizing your voice?

17 A    Yes.

18         MS. SHERMAN:  Can we play that one more time, just

19 maybe from 55 on?

20         (Video plays.)

21         MS. SHERMAN:  Okay.  Can you press pause.

22         (Video stopped.)

23 Q    Now, you see Officer Lombardi open the car door, right?

24 A    Yes.

25 Q    So there's no cell phone in his hand obviously.

1  A     No.

2  Q     And we saw his other hand; it had no cell phone in it,

3  right?

4  A     Yes.

5  Q     And the only way you could possibly be communicating with

6  Officer Lombardi at this point is by cell phone, correct?

7  A     Yes.

8          MS. SHERMAN:  And can we continue watching?

9          (Video played.)  (Video stopped.)

10 Q     So we just saw him grab the door, right?

11 A     Yes.

12         MS. SHERMAN:  Can we go to Government Exhibit 1 and

13 can we go to about 2:25:48.  Sorry.  Maybe like 2:25:45.

14 Perfect.  Press play.

15         (Video plays.)

16         MS. SHERMAN:  Okay.

17         (Video stopped.)

18 Q     Obviously we don't see Officer Lombardi with a cell

19 phone, correct?

20 A     Yes.

21 Q     Okay.  But your testimony is that in the moment that he's

22 getting out of the car, you're saying, "Okay, bye," that we're

23 hearing that, correct?

24 A     Yes.  That's my voice.

25 Q     On the cell phone?

1   A    I believe it is.

2   Q    With Officer Lombardi?

3   A    On the phone with him.

4   Q    Him specifically, none of the other officers in the car?

5   A    On the phone with Lombardi.

6   Q    Okay.

7        THE COURT:  It would be in his left hand, would it,

8   because his right hand, you could see was in the car.

9        THE WITNESS:  In the NYPD vest, there's a lot of

10  pockets you can put the phone in.  There's like a zipper here

11  you can put your phone.

12       Me, being on patrol, I used to keep my phone on my

13  vest because when you have the gun belt on, you can't get in

14  your pocket.  So I would keep the phone on my vest in a

15  pocket.

16       THE COURT:  So he could have had the phone on the

17  vest in the pocket?

18       THE WITNESS:  Yes.

19       THE COURT:  And he could hear you, even though it

20  was in the pocket, is that what you would say?

21       THE WITNESS:  I don't know what he did, but you

22  could put the phone in your pocket and put it on speaker and

23  talk to someone.

24       THE COURT:  So you could still have a conversation

25  if the phone is in the pocket?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  Go ahead.

3          MS. SHERMAN:  I'm sorry.  I'm just trying to think

4    about that for a second.

5          THE COURT:  Think about pocket calls.

6          MS. SHERMAN:  Right.

7    Q    But I just want to be clear.  What you hear, I don't hear

8    it, but what you hear as "Okay, bye" would be your voice; and

9    so, you're saying that if the phone was in the pocket, I guess

10   on speakerphone, that we would be able to hear that on the

11   body camera.

12   A    I believe so.

13   Q    But obviously you're not Officer Lombardi, so you don't

14   know where he was keeping his phone.

15   A    Yes.

16   Q    Okay.  And there's, because you don't remember what phone

17   you used to call what phone he used, we have no record,

18   documentation of that phone call, correct?

19          MS. BELIZAIRE:  Objection.

20          THE COURT:  At present, we don't.

21          You don't have personal knowledge of where he kept

22   the phone?

23          THE WITNESS:  I do not.

24          THE COURT:  And the question was?

25   Q    I asked we have, because you don't know what phone you

1  used and you don't know what phone you called him on, there's
2  no documentation of that call, correct?
3          MS. BELIZAIRE:  I'm still objecting.  Objection.
4          THE COURT:  Sustained.  Speculation.
5          MS. SHERMAN:  Okay.
6  Q    And okay.  Now, you, you testified that you confirmed
7  with Officer Lombardi that they were approaching the correct
8  vehicle, correct?
9  A    Yes.
10 Q    Okay.  And did you speak to a or you did speak to a
11 detective.
12         Do you know a Detective Maier, M-A-I-E-R?
13 A    I'm not sure.  Is that the trigger lock detective?
14         THE COURT:  Is that the what?
15         THE WITNESS:  Trigger lock detective.  I'm not sure.
16         THE COURT:  Well, do you know a Detective Maier?  If
17 you do --
18         THE WITNESS:  I'm not sure.
19 Q    Okay.  Did you speak to anyone -- after this arrest, did
20 you speak to anyone in relation to this federal prosecution?
21 A    Yes.
22 Q    Okay.  Did you speak to anyone about the federal
23 prosecution the day of the arrest?
24 A    Yes.
25 Q    Okay.  And who was that that you spoke to?

1   A    I don't remember what the detective's name was.

2   Q    But it was a detective?

3   A    Yes.

4   Q    Okay.  And you told that detective that you had confirmed

5   with Officer Lombardi that the person, that, you confirmed

6   with Officer Lombardi that Mr. Homer was the person you had

7   seen with the gun when he was approaching the car, correct?

8   A    Yes.

9   Q    Okay.  And then in relation to your work on this case,

10  you didn't take any notes about your work on this case,

11  correct?

12  A    I did not.

13  Q    You didn't document what you had seen, correct?

14  A    No, I did not.

15  Q    You didn't, you didn't speak to anyone who was filling

16  out, any officer who was filling out the complaint report

17  about what you had seen, correct?

18  A    No, I did not.

19  Q    You didn't speak to anyone who was filling out the arrest

20  report about what you had seen, correct?

21  A    No, I did not.

22  Q    And, I think you had mentioned that you had seen this

23  specific van before once.

24        Did you document anything about that van when you

25  observed it that one time?

1  A    I did not.

2            MS. SHERMAN:  Okay.  One second.

3            (Pause.)

4            MS. SHERMAN:  I have no further questions.

5            THE COURT:  Any redirect?

6            MS. BELIZAIRE:  Just one second, Your Honor.

7            (Pause.)

8            MS. BELIZAIRE:  Nothing further from the government.

9            THE COURT:  The witness is excused.  You may stand

10 down, sir.

11            THE WITNESS:  Thank you.

12            THE COURT:  You're welcome.

13            (Witness excused.)

14            THE COURT:  Any further witnesses from the

15 government?

16            MS. BELIZAIRE:  None from the government, Your

17 Honor.

18            MS. SHERMAN:  None from the defense.

19            THE COURT:  All right.  Well, post-hearing

20 submissions.

21            MS. SHERMAN:  Yes.  Are you, is Your Honor asking?

22            THE COURT:  Would like to make a post-hearing

23 submission?

24            MS. SHERMAN:  Yes, I would.

25            THE COURT:  I'm not encouraging it or discouraging

1   it.  I'm just asking the question.

2        MS. SHERMAN:  Yes I think it would be helpful to be

3   able to refer to certain things in the transcript.

4        THE COURT:  All right.  How much time would you

5   like?

6        MS. SHERMAN:  Three weeks?  Is that appropriate?

7        THE COURT:  That certainly is appropriate.

8   November 17th for the submission.

9        MS. SHERMAN:  That's great.  Thank you.

10       THE COURT:  And a response, if any?

11       MS. BELIZAIRE:  Yes, Your Honor.  Your Honor, given

12  that the Thanksgiving holiday is the following week, can I

13  have the 8th?

14       THE COURT:  All right.  December 8th.

15       A reply?  Do you think you'll need a reply?

16       MS. SHERMAN:  I don't --

17       THE COURT:  Why don't we give you until the 22nd of

18  December for the reply.

19       MS. SHERMAN:  Great.  Thank you.

20       THE COURT:  So that you don't have to start passing

21  papers around.

22       MS. SHERMAN:  Thank you, Your Honor.

23       THE COURT:  And is there an application?

24       MS. BELIZAIRE:  Yes, Your Honor.  Given that we are

25  in a motion posture and would be awaiting decision on the

1    motion, the time for speedy trial should be excluded pending

2    the outcome of that motion, and I'm asking the court to

3    exclude it in the interest of justice.

4              MS. SHERMAN:  No objection.

5              THE COURT:  Time is excluded between now and the

6    date of the decision on the motion to suppress between today

7    and the date of decision, in the interest of justice.

8              MS. BELIZAIRE:  Thank you.

9              THE COURT:  On consent of the parties.

10             Okay.  Thank you very much, everybody.

11             MS. SHERMAN:  Thank you, Your Honor.

12             THE COURT:  Have a nice day.

13             MS. BELIZAIRE:  Thank you.

14             MR. GRUBIN:  Thank you, Judge.

15             (Matter concluded.)

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

3    WITNESSES:

4

5        DETECTIVE NICHOLAS CONTE

6            DIRECT EXAMINATION BY MS. BELIZAIRE        13

7            CROSS-EXAMINATION BY MS. SHERMAN          44

8

9

10                      EXHIBITS:

11

12        Government Exhibit 1              22

13        Government Exhibit 6              23

14        Government Exhibit 3              40

15

16

17

18

19

20

21                    *    *    *    *

22

23

24

25