UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

**MEMORANDUM & ORDER**
**23-CR-86 (NGG)**

-against-

ROBERT HOMER,

                              Defendant.

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court is the Government's motion for reconsideration of this court's February 5, 2024 Memorandum and Order ("M&O" or "Order") granting Defendant Robert Homer's motion to suppress evidence. (*See* Mot. for Reconsideration ("Mot. for Recons.") (Dkt. 60); *see also* M&O (Dkt. 53).) For the reasons discussed below, the motion is GRANTED in part and DENIED in part.

## I.   BACKGROUND

On February 14, 2023, Mr. Homer was arrested and subsequently charged with illegal possession of a firearm as a felon, in violation of 18 U.S.C § 922(g)(1).[1] On July 11, 2023, Mr. Homer moved to suppress "all physical evidence recovered from Mr. Homer" on the night of his arrest, including the firearm and "ammunition and all evidence recovered as a fruit of his unlawful arrest." (Mot. to Suppress (Dkt. 23) at 1.) Mr. Homer moved to suppress the fruits of the unlawful arrest on the basis that possession of a firearm "is not sufficient to establish probable cause to believe that Mr. Homer committed a crime." (*Id.* at 7 (citing

---

[1] The court assumes familiarity with the factual background of Mr. Homer's arrest, which is set forth in greater detail in the M&O. (*See* M&O at 1-2.) *See also United States v. Homer*, No. 23-CR-00086 (NGG), 2024 WL 417103, at *1 (E.D.N.Y. Feb. 5, 2024).

*United States v. Gaskin*, 2023 WL 3998329, at *7 (D. Conn. June 14, 2023) and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022).) In the alternative, Mr. Homer sought an evidentiary hearing "be held outside the presence of the jury before trial as to the admissibility of the physical evidence." (Mot. to Suppress at 1.) In opposition, the Government argued that the detective's observation of Mr. Homer with a firearm was sufficient to establish probable cause that Homer was in violation of New York statutes that criminalize possession of a weapon. (Gov't Opp. to Mot. to Suppress (Dkt. 29) at ECF 7 (citing New York Penal Law §§ 265.01, 265.01-b, 265.02, and 265.03).) The Government did not otherwise address the argument raised by the defense concerning how the change in New York's licensing laws after *Bruen* could have affected the probable cause analysis. Because of the issues raised about the reach of the Fourth Amendment after *Bruen*, the court granted Mr. Homer's motion for an evidentiary hearing. (*See* Min. Entry dated 9/18/2023.)

At the hearing, the Government stated multiple times that the hearing was not necessary. (*See* Suppression Hearing Transcript ("Hearing Tr.") (Dkt. 57) at 4:9-10 ("[T]he government's position is that a hearing is not necessary because there is no fact in dispute."); *id.* at 10:13-14 ("I have made clear that a hearing is not necessary because there is no fact in dispute.").) The Government then called one witness, New York Police Department ("NYPD") Detective Nicholas Conte, who witnessed Mr. Homer's possession of a handgun via live surveillance video. (*See id.* at 4:15-16.) The Government did not present any other evidence to the court beyond Detective Conte's testimony. (*See id.*)[2]

In post-hearing briefing, Mr. Homer again argued that suppression was warranted because the "police had no information as to whether the man had a prior felony conviction or did or did not

---

[2] The Government did not call NYPD Officer Anthony Lombardi, who participated in Homer's arrest and was available for the hearing. (*See id.*)

2

have a permit for the gun." (Def. Post-hearing Mem. (Dkt. 44) at
ECF 7.) The Government in its post-hearing briefing engaged for
the first time with Mr. Homer's argument that the Government
did not have probable cause after *Bruen*, but only to say that
"*Bruen* has nothing to do with a probable cause determination"
because licenses are an affirmative defense that defendants can
raise. (Gov't Post-hearing Opp. (Dkt. 46) at 9-10.) The Govern-
ment also found it notable that "at the hearing, despite having an
opportunity to not only ask Detective Conte questions about li-
censing, but to also call Officer Lombardi, the defense curiously
did not ask a single question about it or how *Bruen* has modified,
if at all, any NYPD practices for determining probable cause to
make an arrest." (*Id.* at 9.)

On February 5, 2024, the court granted Mr. Homer's motion to
suppress. (*See* M&O at 15.) After this court granted the Govern-
ment's request for an extension of time to file, the Government
filed the present motion for reconsideration on March 1, 2024,
urging the court to "reconsider its decision so that it may evaluate
certain overlooked material facts and controlling law, as well as
to correct clear errors of law." (Mot. for Recons. at 1.) Specifi-
cally, the Government moves for reconsideration on twelve
grounds, arguing that the court made six legal errors and did not
consider six material facts that, if considered, would change the
outcome of the court's decision. In the alternative, the Govern-
ment seeks an evidentiary hearing to present evidence regarding
firearm licenses in New York City. (*Id.*)

## II. LEGAL STANDARD

"The standard for granting . . . a motion [for reconsideration] is
strict, and reconsideration will generally be denied unless the
moving party can point to controlling decisions or data that the
court overlooked." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257

3

(2d Cir. 1995);[3] *see also In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005) ("Reconsideration is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).

"[A] motion for reconsideration is not an opportunity for litigants to reargue their previous positions or present new or alternative theories that they failed to set forth in connection with the underlying motion." *Corpac v. Rubin & Rothman, LLC,* 10 F. Supp. 3d 349, 351 (E.D.N.Y. 2013). Factual matters must have been put before the court on the underlying motion for a court to grant reconsideration. *Drapkin v. Mafco Consol. Grp., Inc.*, 818 F. Supp. 2d 678, 695 (S.D.N.Y. 2011); *see also Davidson v. Scully*, 172 F. Supp. 2d 458, 463 (S.D.N.Y. 2001) ("It is well established that the submission of new evidence is precluded on a motion for reconsideration.").

## III. DISCUSSION

The crux of the matter is that the Government did not meet its burden to demonstrate probable cause when faced with a motion to suppress evidence gathered from Mr. Homer's warrantless arrest. The court thus first reviews the burden shifting framework under Second Circuit law before addressing each of the Government's arguments raised in its motion for reconsideration.

---

[3] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

## A. The Burden on the Underlying Motion to Suppress

The defendant "bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure." *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)). Once established, the burden shifts to the government "to demonstrate that its agents had probable cause to justify a warrantless search." (M&O at 3 (citing *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008)).) The government "must make this showing by a preponderance of the evidence." *United States v. Goines,* 604 F. Supp. 2d 533, 539 (E.D.N.Y. 2009). In this case, there is no dispute that Mr. Homer was arrested without a warrant. The burden was therefore on the Government to establish that there was sufficient probable cause to arrest Mr. Homer.

The Government states that it presented evidence it believed was "sufficient to demonstrate probable cause as understood in the Second Circuit for many years." (Mot. for Recons. at 4.) Relying on the testimony of Detective Conte, the Government showed that Detective Conte saw Mr. Homer in the driver's seat of a silver minivan that Detective Conte believed, based on his experience investigating a local gang, to be affiliated with said gang. While in the car, Mr. Homer had "no firearm discipline" and placed the gun directly in his pocket. (Gov't Post-hearing Opp. at 4.) Detective Conte then called Officer Lombardi, an officer on duty, to arrest Mr. Homer and seize the firearm. All of this occurred after 2 a.m. in a high crime area. The Government justified its lack of attention to *Bruen* and New York's newfound status as a "shall issue" state because "the exemption of a licensed person from prosecution is an affirmative defense to be advanced by the defendant," so any change to *licensing* pursuant to *Bruen* did not "affect the probable cause calculus in this case whatsoever." (*Id.* at 10.)

5

Implicit in the Government's arguments on reconsideration is that the court's M&O granting suppression caught the Government by surprise—the Government did not present evidence to the court about *Bruen's* impact on the probable cause inquiry because it determined that it did not need to based on the structure of New York State's gun laws. The Government argues it should therefore be granted the opportunity to present evidence now because it could not have foreseen the "new rule" created by the court's decision.[4] Not so. In its post-hearing briefing, the Government identified the new licensing regime, but argued that *Bruen* did not affect the probable cause calculus in this case. (*See* Gov't Post-hearing Opp. at 9-10.) But the Government erred and incorrectly believed that it was Mr. Homer's burden to raise facts that demonstrate that nothing in the probable cause analysis changed after *Bruen*. (*See id.* ("[D]espite having an opportunity to not only ask Detective Conte questions about licensing, but to also call Officer Lombardi, the defense curiously did not ask a single question about it or how *Bruen* has modified, if at all, any NYPD practices for determining probable cause to make an arrest").)

And while the Government notes surprise by what it refers to as the court's "new rule," the reasoning in the court's M&O was by no means novel. It accords with the district court for the District of Connecticut's analysis in *United States v. Gaskin*, which Mr. Homer cited in his suppression motion and his post-hearing briefing. (*See* Mot. to Suppress at 7 (citing *United States v. Gaskin*, No. 22-CR-98, 2023 WL 3998329, at *6 (D. Conn. June 14, 2023));

---

[4] In its motion for reconsideration, the Government refers to the M&O as the "February 5th New Rule." Inadvisable legal writing aside, *cf.* Antonin Scalia & Bryan Garner, Making Your Case: The Art of Persuading Judges (2008) at 33-34 (counseling practitioners to assume a posture of respectful intellectual equality with the bench), it is incorrect that this court created a new rule. This court applied the law to the facts presented in order to resolve a dispute in the particular case before it.

Def. Post-hearing Mem. at ECF 6-7 (same).) In *Gaskin*, the defendant was arrested for unlawful possession of a firearm in violation of a Connecticut statute that prohibits possession of firearms in vehicles without a license. *Gaskin*, 2023 WL 3998329, at *6 & n.12. The *Gaskin* court, relying on *Bruen*, ruled that there was not probable cause to arrest. *Id.* at *7. The court stated that, for the defendant's arrest to be lawful, "there needed to have been some evidence indicating the probability that [the defendant] was not licensed to possess a firearm. Absent such information, there could not have been probable cause to arrest [the defendant]." *Id.* at *6; *see also id.* at *7.

And long before Mr. Homer moved for suppression, state courts and sister circuits that cover "shall issue"[5] states grappled with the boundaries of the Fourth Amendment with respect to searching individuals with guns.[6] The Supreme Judicial Court of

---

[5] In *Bruen*, the Court defined "shall issue" states as those in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen*, 597 U.S. at 13. By contrast, New York was one of seven jurisdictions with "may issue" licensing laws in which "authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." *Id.* at 14-15. In *Bruen*, the court struck New York's "proper cause" requirement, *see id.* at 71, converting New York from a "may issue" jurisdiction to a "shall issue" jurisdiction.

[6] *See, e.g., United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012) (Virgin Islands) ("It is lawful for certain individuals in the Virgin Islands to carry a firearm provided that a license is obtained. . . . [This Circuit] recognized that the possession of a firearm in the Virgin Islands, in and of itself, does not provide officers with reasonable suspicion to conduct a *Terry* stop."); *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) (North Carolina) ("[W]here a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states."); *Northrup v.*

Massachusetts's reasoning in *Commonwealth v. Guardado*, 206 N.E.3d 512 (Mass. 2023) is particularly informative. Massachusetts was one of the seven jurisdictions that was a "may issue" state prior to *Bruen*. *Bruen*, 597 U.S. at 15; *Guardado*, 206 N.E.3d at 522. As in New York, a license was an affirmative defense to prosecution rather than an element under Massachusetts law. *Guardado*, 206 N.E.3d at 522. After *Bruen*, Massachusetts's highest court ruled in *Guardado* that a defendant could not be forced to bear the burden of establishing that he or she had a license;

---

*City of Toledo Police Dep't*, 785 F.3d 1128, 1131-33 (6th Cir. 2015) (Ohio) ("To allow stops in [an open carry state] "would effectively eliminate Fourth Amendment protections for lawfully armed persons."); *United States v. Williams*, 731 F.3d 678, 694 (7th Cir. 2013) (Hamilton, J., concurring) (Wisconsin) ("After *Heller* and *McDonald*, all of us involved in law enforcement, including judges, prosecutors, defense attorneys, and police officers, will need to reevaluate our thinking about these Fourth Amendment issues and how private possession of firearms figures into our thinking."); *Duffie v. City of Lincoln*, 834 F.3d 877, 883 (8th Cir. 2016) (Nebraska) ("[T]he mere report of a person with a handgun is insufficient to create reasonable suspicion."); *United States v. Brown*, 925 F.3d 1150, 1154 (9th Cir. 2019) (Washington) ("In Washington State, it is presumptively lawful to carry a gun. It is true that carrying a concealed pistol without a license is a misdemeanor offense in Washington. . . . Notably, Washington is a 'shall issue state,' meaning that local law enforcement *must* issue a concealed weapons license if the applicant meets certain qualifications.") (emphasis in original); *United States v. Turner*, 827 F. App'x 996, 997-98 (11th Cir. 2020) (Florida) ("When [the detective] saw a gun in plain view in the front passenger's waistband, the detective had reasonable suspicion to remove the passenger from the car to determine whether he possessed a valid permit to carry a concealed weapon."); *United States v. Blackman*, No. 18-CR-00728, 2023 WL 3346822, at *17 (N.D. Ill. May 10, 2023) (Illinois) ("Upon opening the box, the officers found 173 rounds of ammunition. This, in turn, constituted probable cause to arrest [the defendant] based upon his possession of the box and his admission that he did not have a [Firearm Owner's Identification] card."); *Commonwealth v. Hicks*, 208 A.3d 916, 936 (Pa. 2019) (Pennsylvania) ("[A] police officer may [not] infer criminal activity merely from an individual's possession of a concealed firearm in public. . . . [I]t is not a criminal offense for a license holder . . . to carry a concealed firearm in public.").

8

instead, given the holding in *Bruen* that "possession of a firearm outside the home is constitutionally protected conduct," failure to obtain a license is a necessary element of the crime of unlawful possession of a firearm. *Id.* at 538-39.

The decisions from the Third, Fourth, Sixth, Seventh, Ninth, and Eleventh Circuits, from the District of Connecticut and the Northern District of Illinois, and from Pennsylvania and Massachusetts state courts deal with different state statutory regimes and different procedural postures, and do not dictate the outcome in this case. *See supra* note 6. But they all indicate that *Bruen*, which forced New York to dramatically change its firearm licensing regulatory regime and become a "shall issue" state, had the potential to fundamentally alter how state governments enforce their gun laws. Even though New York used to require applicants to show "proper cause" to receive a firearm license, its licensing regime now more closely mirrors that of "shall issue" states. The Government was free to rely solely on its argument that, even after *Bruen* and the subsequent changes to New York's firearm licensing laws, a license was an affirmative defense and so licensure was not relevant for the probable cause inquiry. But as the party with the burden of justifying a warrantless arrest, it did so at its own risk.

The court now turns to the Government's objections on reconsideration to the court's Order. The Government argues that the court made six clear legal errors and that it did not consider six facts that would change the outcome of the case. The Government's objections are each addressed below.

## B. Legal Arguments

The Government seeks reconsideration on the grounds that the court misapplied Second Circuit precedent concerning probable cause, deference to state court interpretations of state law, innocent explanations, *Terry* stops, the plain view doctrine, and

identity suppression. The Government does not point to controlling Second Circuit precedent that would dictate a different outcome on any of these grounds. However, the court does agree that its discussion of the plain view doctrine and identity suppression were unclear and clarifies its holding with respect to those issues as detailed below.

### 1.   Probable cause

The Government contends that the court committed clear error in its treatment of two cases that show that probable cause existed to arrest Mr. Homer. (Mot. for Recons. at 9-10 (citing *United States v. Vasquez*, 864 F. Supp. 2d 221 (E.D.N.Y. 2012) and *United States v. Hagood*, 78 F.4th 570 (2d Cir. 2023)).) The events in both cases predate *Bruen* and neither case supports the Government's argument on reconsideration.

*Vasquez* is a district court case decided before *Bruen* in which the court found probable cause to arrest based on criminal possession of a weapon under New York's prior gun laws when the defendant was observed with a handgun. *Vasquez*, 864 F. Supp. at 239. In analyzing *Vazquez*, the court stated that the suspect in the case notified police he was on parole during the arrest rather than, as the Government correctly notes, after he was under arrest. (*Compare id.* at 223, *with* M&O at 6-7.) However, a district court case is not controlling such that reconsideration is appropriate. *See Ades v. Deloitte & Touche*, 843 F. Supp. 888, 892 (S.D.N.Y. 1994). And after reviewing *Vasquez*, it does not provide cause to reconsider the M&O.

*Hagood* is a Second Circuit case that involves an arrest made in 2020—two years before *Bruen* forced New York to change its gun licensing laws. 78 F.4th at 572. The case considered whether the officers had reasonable suspicion to perform a *Terry* stop—not probable cause to arrest—and makes no reference to *Bruen*. *Id.*

10

at 575-77. It is therefore likewise inapplicable.[7] That the decision was published in 2023 or that the panel discussed *Bruen* during oral arguments, (*see* Mot. for Recons. at 9-10), does not make the decision controlling on the facts of this case.

2.   New York State law on affirmative defenses

The Government next objects to the court's treatment of New York law. According to the Government, "under longstanding New York law, having a license is an affirmative defense that must be raised by the defendant, not a fact about which a police officer must have certainty prior to making an arrest." (Mot. for Recons. at 11.) Because federal courts must defer to state court interpretations of state law, the Government argues that the court clearly erred when it concluded that licensure was relevant to the probable cause inquiry.

"It is axiomatic . . . that when interpreting state statutes federal courts defer to state courts' interpretation of their own statutes." *United States v. Fernandez-Antonia*, 278 F.3d 150, 162 (2d Cir. 2002). When state law is unclear, the "court must carefully review available resources to predict how the New York Court of Appeals would resolve the questions at bar." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994). "In considering state decisional law, [the court] must afford the fullest weight to the pronouncements of the New York Court of Appeals." *Id.* "[W]here there is no decision by the state's highest court then federal authorities must apply what they find to be the state law after giving proper regard to relevant rulings of other courts of the State." *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d

---

[7] In its M&O, the court cited to *Hagood* to stand for the proposition that "[e]ven after *Bruen*, police officers have reasonable suspicion to justify a *Terry* stop when seeing someone they suspect has a gun." (M&O at 14.) The court does not change its assessment though it notes that *Hagood*, based on a pre-*Bruen* arrest, cannot stand as controlling authority for that proposition.

101, 119 (2d Cir. 2001). When determining how to rule on an unsettled issue of state law, "a federal court is free to consider all of the resources to which the highest court of the state could look, including decisions in other jurisdictions on the same or analogous issues." *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48 (2d Cir. 1993); *see also Travelers Ins. Co.*, 14 F.3d at 119 ("We will also consider relevant cases from jurisdictions other than New York in an effort to predict what would be the decision of reasonable intelligent lawyers, sitting as judges of the highest New York court, and fully conversant with New York 'jurisprudence.'").

The court's Order followed Second Circuit guidance on how to interpret state law when state law is unclear. To predict whether the New York Court of Appeals would treat gun licenses under the new licensing regime as an affirmative defense, the court analyzed three Court of Appeals opinions. (*See* M&O at 7-9 & n.4 (discussing *People v. Kohut*, 30 N.Y.2d 183, 187 (N.Y. 1972), *People v. Davis*, 13 N.Y.3d 17, 20-21 (N.Y. 2009), and *People v. Santana*, 7 N.Y.3d 234, 236 (N.Y. 2006)).) Based on this assessment, it determined that, contrary to the Government's assertion, the Court of Appeals does not strictly follow the rule that exemptions from prosecution within the defining statute are elements and those without are affirmative defenses. Instead, the Court of Appeals determines whether an exception is an element or a defense based on the tools of statutory interpretation.

In its briefing, the Government relied on an intermediate appellate court's decision, *People v. Washington*, 209 A.D.2d 162, 163 (N.Y. App. Div. 1994), to argue that licensure was an affirmative defense under New York law. (*See* Gov. Post-hearing Opp. at 10.) Because the licensing exemption was found outside of the defining statute for the crime, the court in *Washington* held that the burden was on the defendant to raise the existence of a license as a defense to prosecution. *Washington*, 209 A.D.2d at 163.

12

Therefore, according to the Government, *Washington* showed that any change to the licensing regime after *Bruen* "does not affect the probable cause calculus in this case whatsoever." (*See id.*)

The court gave "proper regard" to the intermediate court's holding in *Washington* but declined to follow it, reasoning that "[w]hen an exemption from prosecution is sufficiently broad, the . . . separation of affirmative defenses from the probable cause analysis would allow law enforcement to search and seize persons based on primary conduct that is legal." (M&O at 10.) Implicit in this reasoning was that such an interpretation would risk running afoul of the Fourth Amendment in a state with a "shall issue" licensing regime. *Cf. United States v. Black,* 707 F.3d 531, 540 (4th Cir. 2013) (holding that allowing an investigatory detention for possession of a firearm in a state that allows individuals to carry firearms with a license "would eviscerate Fourth Amendment protections for lawfully armed individuals in those states."). Though the court did not address whether *Bruen* required licensure to be an element of the relevant firearm crime, it considered whether a person with a firearm had a license to be relevant for determining whether police had probable cause to believe that the person was guilty of a crime. The Government has not demonstrated that the court failed to follow Second Circuit precedent in its M&O by failing to follow New York law; instead, it disagrees with the court's assessment of New York law. That is an insufficient basis to argue for reconsideration.

Moreover, the court's analysis of New York law is consistent with the Court of Appeals' recent decision in *People v. David,* 2023 WL 8039651, at *2 (N.Y. Nov. 21, 2023), which addressed how exemptions relate to affirmative defenses under New York criminal statutes. In *David,* the defendant challenged his conviction for criminal possession of a weapon. *Id.* at *1. In doing so, he raised the same issues about which party has the burden of production to establish licensure under New York's licensing statute, New

13

York Penal Law § 265.20, that were relevant in this case. *See id.* at \*2. The defendant argued that the interpretation of licensure as an affirmative defense violated due process because it treated presumptively innocent conduct as unlawful and shifted the burden to the defendant to prove otherwise. *Id.*

The Court of Appeals clarified that it determines whether an exemption is an affirmative defense based on statutory interpretation rather than a rigid rule. When an "exemption is not found within the text of the relevant Penal Law provision criminalizing possession of a weapon, it presumptively operates as a proviso that need not be pleaded but may be raised by the accused as a bar to prosecution or a defense at trial." *Id.* The Court of Appeals reasoned that the placement of an exemption outside of the statute was relevant for understanding how to presumptively, based on common sense, read the elements of a statute. *See id.* (*See also* M&O at 8 n.4 (predicting that the New York Court of Appeals would determine whether an exemption is an affirmative defense based on the tools of statutory interpretation).) But this only creates a presumption that can be rebutted.

The court predicts that the Court of Appeals would construe the statute in a way that avoids constitutional questions. *See People v. Viviani,* 36 N.Y.3d 564, 579 (N.Y. 2021). In *David,* after noting how it would presumptively read the licensing statute, it expressly declined to address the impact of *Bruen* because the defendant had not preserved the arguments:

> Turning to the impact of *Bruen,* the Supreme Court's decision effected a substantial change in Second Amendment jurisprudence, . . . and [the defendant] raises meaningful questions about New York's statutory scheme in its wake (*cf. Commonwealth v. Guardado,* 491 Mass. 666, 206 N.E.3d 512 (2023) (holding that Massachusetts statute prohibiting public possession of loaded

firearms but allowing affirmative licensure de-
fense violated due process because lack of license
must be essential element of crime under *Bruen*)).
But the "mode of proceedings" exception . . . does
not provide a basis for reaching [the defendant's]
unpreserved arguments. *David*, 2023 WL
8039651, at *3.

Given the potential issues with construing licensure as an affirm-
ative defense in a "shall issue" state under the Second, Fourth,
and Fourteenth Amendments[8] after *Bruen*, the court predicts that
the Court of Appeals would follow the Massachusetts Supreme
Judicial Court's analysis in *Guardado* and not treat licensure as
an affirmative defense. In the absence of more clear controlling
precedent to the contrary, the court finds this to be the best in-
terpretation of how the Court of Appeals would rule on this issue.
The court therefore declines to reconsider its interpretation of
New York law.

### 3.  Second Circuit precedent on innocent explanations

Next, the Government contends that the court's M&O misapplied
Second Circuit precedent "holding that innocent explanations for
conduct generally do not vitiate probable cause." (Mot. for Re-
cons. at 13.) The Government misreads Second Circuit caselaw
on probable cause and innocent explanations. In *United States v.
Webb*, the Second Circuit held that "in order to ascertain whether
[the defendant] was properly arrested, we must determine

---

[8] *See Herrington v. United States*, 6 A.3d 1237, 1244 (D.C. 2010) (striking
District of Columbia's licensure affirmative defense for possession of hand-
gun ammunition in the home as violating the Second Amendment and due
process after *Heller* and *McDonald*); *Guardado*, 206 N.E.3d at 536-39
(holding that the Second and Fourteenth Amendments required that licen-
sure be an element of firearm offenses); *Black*, 707 F.3d at 540 (holding
that permitting investigatory detentions based on firearm possession in a
state that "shall issue" firearm licenses would "eviscerate" Fourth Amend-
ment protections for lawful gun owners).

whether [the law enforcement officer] had sufficient evidence to cause a reasonable and prudent man to believe [the defendant] had [committed a crime]." 623 F.2d 758, 762 (2d Cir. 1980). The arrest is not made unconstitutional by the defendant's "proffered innocent explanations"—innocent explanations cannot negate probable cause that already existed. *Id.; see also United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985).

Here, the court ruled that Officer Lombardi did not have probable cause to arrest Mr. Homer. The court did not rely on Mr. Homer's post-arrest statements that "police were planting a gun on him." (Mot. for Recons. at 13 n.12.) Therefore, Second Circuit cases on innocent explanations are inapplicable.

### 4. *Terry* stops

The Government next challenges the discussion in the court's Order in which it noted that police had the option to conduct a *Terry* stop. This was dicta, and although the court found it worth noting, it was "unnecessary to the decision in the case." *Dallio v. Spitzer*, 343 F.3d 553, 566 (2d Cir. 2003) (Katzmann, J., concurring) (citing definition of dictum in Black's Law Dictionary 1100 (7th ed. 1999)). It is unclear what the Government would like the court to reconsider on this point—the court could strike the entire discussion and it would not change the outcome. This is not a proper argument to raise on a motion for reconsideration. *See Shrader*, 70 F.3d at 257 (holding that on a motion for reconsideration, courts must only consider matters "that might reasonably be expected to alter the conclusion reached by the court.").

However, it is worth briefly addressing the Government's concerns. In the M&O, the court stated that New York law permitted *Terry* stops generally when police officers have reasonable suspicion of criminal activity, and that the police officers could have conducted a license check on Mr. Homer. (*See* M&O at 14 (citing N.Y. Crim. Proc. Law § 140.50).) The Government stressed that

16

holding law enforcement to such a standard would be "impracti-
cable" because "[i]n crowded locations, where officers are
outnumbered by perpetrators or even citizens gathering to
watch, it would be unsafe and unworkable to isolate an individ-
ual for the period of time it would take to investigate and confirm
whether he or she has a gun license." (Mot. for Recons. at 14.)
However, because firearms create unique risks for police officers
in precisely the circumstances that the Government raised, New
York law places additional requirements on licensees that are car-
rying firearms:

> Every licensee while carrying a pistol or revolver
> shall have on his or her person a license to carry
> the same. . . . Upon demand, the license shall be
> exhibited for inspection to any peace officer, who
> is acting pursuant to his or her special duties, or
> police officer. . . . Failure of any licensee to so ex-
> hibit or display his or her license, as the case may
> be, shall be presumptive evidence that he or she is
> not duly licensed. N.Y. Penal Law § 400.00(8).

Section 400.00(8) allows police officers to quickly determine li-
censure, even short of a license check. The court is not persuaded
that its discussion of *Terry* stops was erroneous.

### 5.   Plain View Doctrine

The Government argues that the court's M&O "is contrary to Sec-
ond Circuit authority on the plain view doctrine." (Mot. for
Recons. at 9.) Interestingly, despite this assertion, the Govern-
ment does not discuss what the court said about the plain view
doctrine or cite to any Second Circuit authority that would re-
quire a different outcome. The court's only discussion of the plain
view doctrine occurred in a footnote addressing what evidence
was to be suppressed: "Detective Conte saw Mr. Homer's posses-
sion of a firearm in plain view of the ARGUS camera. Therefore,
it is possible that the evidence that is the fruit of the unlawful

search is not the physical evidence, but Mr. Homer's identity, including his status as a felon." (M&O at 3-4 n.3.) Upon reconsideration, this statement was insufficiently precise to provide the parties with clear guidance about what evidence was subject to suppression. Based on controlling precedent from the Supreme Court and Second Circuit, the plain view exception to the Fourth Amendment's warrant requirement does not apply.

"When an officer, during a justified intrusion, encounters incriminating evidence, the [plain view] doctrine serves to supplement the prior justification." *United States v. Babilonia*, 854 F.3d 163, 180 (2d Cir. 2017). "[P]lain view alone is never enough to justify the warrantless seizure of evidence." *Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971) (plurality opinion); *Horton v. California*, 496 U.S. 128, 136 (1990). "[I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). However, if "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object," then the "incriminating character" of the evidence is not "immediately apparent," and the plain view doctrine does not apply. *Id.* Seizure of physical evidence under the plain view doctrine requires probable cause. *See Arizona v. Hicks*, 480 U.S. 321, 326 (1987).

In Mr. Homer's case, the object seen in plain view is the same one that the Government argued provided probable cause to arrest. There was no separate justified intrusion. *Cf. Santos v. Zabbara*, 984 F. Supp. 2d 106, 124 (E.D.N.Y. 2013) (arrest for possession of fighting roosters was reasonable under the plain view doctrine even though the original warrant to search premises was for drugs). Detective Conte saw the firearm in plain view, but the

incriminating character of the firearm was not immediately apparent for the same reason that the court ruled that Mr. Homer's arrest was unlawful. The lack of information about Mr. Homer's licensure doomed both. For these reasons, the court clarifies that the plain view doctrine does not justify the warrantless seizure of the firearm.

### 6.   Identity suppression

Finally, the Government argues that the court erred in suppressing evidence of Mr. Homer's identity and his status as a felon because Mr. Homer did not request this relief and it is unclear what suppression of identity evidence means in this context. (Mot. for Recons. at 17.) The court disagrees that Mr. Homer's suppression motion was not broad enough to encompass identity, but it agrees that its discussion of identity in the M&O was unclear (and ultimately unnecessary). The court therefore grants the Government's motion to reconsider the reference to identity suppression.

### a.   *The text of Mr. Homer's suppression motion was broad*

In the notice of his motion to suppress, Mr. Homer sought to suppress "all physical evidence recovered from Mr. Homer on February 14, 2023, including a .45 mm Glock semiautomatic pistol and ammunition and all evidence recovered as a fruit of his unlawful arrest." (Mot. to Suppress at 1.)[9] The pistol and ammunition are listed as examples of physical evidence, and "all"

---

[9] For clarity, the court notes that Mr. Homer's notice of his motion to suppress was filed in a combined document with his memorandum of law in support of the motion. Therefore, the first page of Mr. Homer's motion is the "Notice of Motion to Suppress," (*see* Mot. to Suppress at 1), and the pages following that Notice, (*id.* at 2-11), comprise his Memorandum of Law.

evidence recovered as a fruit" could therefore be read as a third example of physical evidence.

But that reading is inconsistent with the broad language that Mr. Homer used. "Fruit" is a term of art that refers to tangible and intangible evidence alike. *See United States v. Crews*, 445 U.S. 463, 470 (1980). When listing examples of "all physical evidence," it would be superfluous to list two specific examples of physical evidence and then one catch-all for all other potential examples of physical evidence. The phrase "all physical evidence" already does that work. Instead, the court read Mr. Homer's motion as seeking suppression of physical evidence, including the firearm and ammunition, and all evidence recovered as a fruit of his arrest, including his identity. This reading is further supported by Mr. Homer's later request for suppression of "all fruits obtained," with no qualification. However, while the language was broad enough to cover intangible evidence, the court cited to a line of cases that discussed identity suppression in the context of the court's jurisdiction. (*See* M&O at 3-4 n.3.) Because the legal issues in these cases are inapplicable to the facts of Mr. Homer's case, the court reconsiders its decision to specifically identify identity as one of the fruits of the unlawful search because it is not necessary on this motion to define the boundaries of the "fruit" of Mr. Homer's arrest.

### b. *Olivares-Rangel and Second Circuit Precedent*

In its Order, the court noted that Mr. Homer's "identity, including his status as a felon," was the fruit of the unlawful seizure. (M&O at 3-4 n.3.) To support this proposition, the court relied in part on the Tenth Circuit's decision in *United States v. Olivares-Rangel*, 458 F.3d 1104 (10th Cir. 2006). Upon further review of *Olivares-Rangel* and Second Circuit caselaw, the court erred when it applied cases concerning immigration proceedings to the facts of this case.

The court's citation[10] to *Olivares-Rangel* complicated an otherwise straightforward issue: under the Supreme Court's holding in *Crews*, the exclusionary rule applies to "any fruits," including any intangible evidence that the Government used to learn Mr. Homer's name and link that name to a felony conviction. *Crews*, 445 U.S. at 470. In Mr. Homer's case, this intangible evidence formed the basis for the criminal complaint. (*See* Compl. (Dkt. 1) ¶ 5.)

The Government relies on the Second Circuit's summary order in *Reyes-Basurto v. Holder* to argue that the court committed clear error as it relates to the suppression of Mr. Homer's identity. (*See* Mot. for Recons. at 18 (citing *Reyes-Basurto v. Holder*, 477 Fed. App'x. 788 (2d Cir. 2012) (Summary Order)).)[11] According to the Government's interpretation of *Olivares-Rangel* and *Reyes-Basurto*, when the police identify a defendant using routine police processing methods, such as fingerprinting, and there are pre-existing records independent of the arrest (in this case, Mr. Homer's prior convictions), identity is not suppressible. (*See id.*)

---

[10] In *Olivares-Rangel*, a criminal case, the Tenth Circuit held that the Supreme Court's decision in *I.N.S. v. Lopez-Mendoza* "does not prevent the suppression of all identity-related evidence. Rather, *Lopez-Mendoza* merely reiterates the long-standing rule that a defendant may not challenge a court's jurisdiction over him or her based on an illegal arrest." *Olivares-Rangel*, 458 F.3d at 1106 (10th Cir. 2006) (citing *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984)).

[11] Though not relevant for the decision on the present motion, it is worth noting that *Reyes-Basurto v. Holder* does not serve as controlling authority that would warrant reconsideration. *Pretzantzin v. Holder*, a precedential Second Circuit opinion, cites favorably to the Tenth Circuit's decision in *Olivares-Rangel*, *see*, 736 F.3d 641, 646-50 (2013), and declines to follow *Reyes-Basurto*, "a non-precedential summary order." *See id.* at 651-52 (suppressing alienage-related evidence in a civil deportation proceeding because the government failed to demonstrate that it obtained the evidence independently of any constitutional violation).

*Reyes-Basurto* is not controlling in this case for two reasons. First, the case involves the Second Circuit's review of civil deportation proceedings, and "[o]utside of the criminal context, . . . the applicability of the exclusionary rule becomes less certain." *Pretzantzin v. Holder*, 736 F.3d 641, 646 (2d Cir. 2013). The outcome of *Reyes-Basurto* therefore was the result of an exclusionary rule that did not operate as broadly as it does in the criminal context. Second, in the immigration setting, identity evidence is relevant in a way not relevant here—once a noncitizen is identified as not legally in the country, he or she faces civil or criminal sanctions based on his or her immigration *status*. The suppression of identity is therefore complicated in the immigration setting because it intersects with questions about the court's jurisdiction and the practical necessity of a court to identify the party before it.[12]

Mr. Homer's case is distinct. Mr. Homer did not face criminal sanctions independent of the circumstances of his arrest. Though there is "pre-existing evidence" of Mr. Homer's criminal history, that alone is not the basis for Mr. Homer's criminal sanctions in this case. Mr. Homer's identity was used to establish one of the elements of the crime for felon in possession of a firearm—namely, that he was a felon. His identity was not linked to pre-

---

[12] If a noncitizen is removable, then the government has this information independent of any arrest. The "pre-existing evidence" that the *Reyes-Basurto* court cites to is the petitioner's alienage—even if there were a Fourth Amendment violation, once the petitioner was identified, the court reasoned, his identity could not be suppressed because he was already "a 'suspect' in regards to removability even before his arrest." *Reyes-Basurto*, 477 F. App'x at 789. Even if the initial search was unlawful, the government in civil deportation proceedings was not required to ignore already existing evidence that the petitioner was deportable. Similarly, in *Olivares-Rangel*, the criminal defendant was charged with a violation of 8 U.S.C. § 1326, which criminalizes *presence* in the United States after previously being deported. *See Olivares-Rangel*, 458 F.3d at 1105 (citing 8 U.S.C. § 1326).

existing records that indicated that his *status* was illegal, as was the case in *Reyes-Basurto* and *Olivares-Rangel*.[13] Thus, under *Crews*, it would have been more proper for the court to have simply stated the fruits of Mr. Homer's arrest were suppressed, with an understanding that "fruits" encompasses intangible evidence and records of Mr. Homer's status as a felon that were obtained as a result of Mr. Homer's arrest and his identification.

For the reasons discussed here and in the above analysis of the plain view doctrine, *see supra* III.B.5, footnote 3 of the M&O is more confusing than illuminating. The court therefore modifies the Order and STRIKES footnote 3.

### C.   Factual Arguments

The Government's next set of arguments concerns the court's consideration of "pertinent facts" that formed the basis for its M&O. (Mot. for Recons. at 5-8, 14.) The Government asserts that the court "considered certain facts but did not give them their appropriate weight." (*Id.* at 14.)[14] As previously discussed with respect to affirmative defenses, disagreements with the court's analysis or legal determinations are not a valid bases for reconsideration, and the court does not specifically address the weighting of those facts here. *See E.E.O.C. v. Bloomberg L.P.*, 751

---

[13] A more apt analogy of the facts presented in *Reyes-Basurto* and *Olivares-Rangel* to these criminal proceedings would be if identity evidence from an unlawful arrest were used to determine that a defendant had an outstanding arrest warrant. In that hypothetical, there would be pre-existing records in the Government's possession independent of the unlawful arrest itself; the routine police processing of the defendant would simply identify the defendant as facing an unrelated warrant. But that is not the case here.

[14] The Government challenges the weight given to the following facts that the court addressed in its M&O: "(1) the defendant was in the driver's seat of the minivan; (2) the minivan was associated with a local gang; (3) the defendant had no firearm discipline; (4) the defendant was in a high crime area; and (5) it was past 2:00 a.m." (*Id.*)

F. Supp. 2d 628, 651 (S.D.N.Y. 2010). The Government then argues that the court did not consider licensing data that demonstrates "minimal change in lawful guns since *Bruen.*" (Mot. for Recons. at 6.) Finally, the Government points to five facts that it presented at the evidentiary hearing that it argues the court overlooked.

The court first addresses the Government's newly presented licensing data. Then it addresses the Government's argument that the police had probable cause based on Mr. Homer's statements during the arrest. Finally, it considers whether the other points raised by the Government, when considered in the totality of the circumstances, are sufficient to show that the court committed clear error when it found that the Government did not have probable cause to arrest Mr. Homer.

### 1.   Licensing Data

To support its motion for reconsideration, the Government submits an affidavit showing that the number of concealed carry licenses did not meaningfully increase between June 23, 2022, when *Bruen* was decided, and February 14, 2023, the date of Mr. Homer's arrest. (*See* Affidavit of NYPD Sergeant David Blaize ("Blaize Aff.") (Dkt. 60) at ECF 21-23.) The number of new licenses granted between June 2022 and February 2023 was insubstantial, increasing from 7,384 to 7,621. (*See* Blaize Aff. at ECF 23.) As a share of the population, the percentage of residents that could lawfully carry a firearm in New York City increased from 0.111 percent to 0.115 percent. (See Mot. for Recons. at 8.) The Government therefore submitted the Blaize Affidavit to provide evidence that it believed "might reasonably be expected to alter the conclusion reached by the court." (Mot. for Recons. at 8 (citing *Shrader,* 70 F.3d 255 at 257).)

As a preliminary matter, the affidavit is not properly before the court on a motion for reconsideration. *See* EDNY Local Rule 6.3 ("No affidavits shall be filed by any party unless directed by the

Court."); *Davidson*, 172 F. Supp. 2d 458, 463-64 ("Because the motion for reconsideration does not afford the losing party the right to submit new evidence to bolster relief, parties are not to submit affidavits in support of a Local Rule 6.3 motion for reconsideration unless directed by the court."). The contents of the Blaize Affidavit—data on the number of concealed carry licenses issued as of February 14, 2023—was available and could have been presented at the evidentiary hearing that took place on October 26, 2023.

But even if the Blaize Affidavit were properly before the court, it is insufficient to establish a "need to correct a clear error or prevent manifest injustice," as is required to warrant reconsideration. *Virgin Atl. Airways*, 956 F.2d at 1255. District courts in this Circuit have defined manifest injustice as "an error committed by the trial court that is direct, obvious, and observable." *Corpac*, 10 F. Supp. 3d at 354. The Blaize Affidavit does not satisfy this high burden.

Had the Government timely presented the affidavit, the court may have considered the data in its statement that "the practical effect of the amendment to [N.Y. Penal Law] § 400.00(2)(f) is to make gun licenses for public carry significantly more accessible" to emphasize that licenses are legally more accessible, if not practically. (M&O at 10.) But that sentence was not the basis for this court's decision. Nor could it have been. The Order based its decision on the fact that the New York legislature amended its firearm licensing statute to require licensing officers to issue a concealed carry license to "any person," as opposed to requiring applicants to document specific threats to personal safety under the prior firearm licensing regime. (*See id.* at 7-10.) And the court relied on *Bruen's* holding that the Second Amendment presumptively guarantees a right to bear arms in public for self-defense. (*Id.* at 10.)

Indeed, the Supreme Court has explicitly rejected the approach that the Government puts forth in its motion for reconsideration, and there are good reasons for this. In *Maryland v. Pringle,* the Supreme Court held that the probable cause inquiry is "incapable of precise definition or quantification into percentages." 540 U.S. 366, 371 (2003). If the court were to change its decision based on the Blaize Affidavit and disregard the text of New York's revised licensing statute and the Supreme Court's interpretation of the Second Amendment, it would be reducing the probable cause determination to the exact formulaic definition that is not permitted. The Government would have the look instead to population percentages rather than the breadth of New York's firearm licensing laws post-*Bruen* to determine whether enough New Yorkers have licenses such that the sight of a gun meets some definable percentage that no longer allows warrantless arrest. Though useful context, the Blaize Affidavit is insufficient to alter the court's conclusion.

Further cautioning against reconsidering the court's decision based on the Blaize Affidavit is the fact that there is no evidence that these data were within the officer's knowledge when arresting Mr. Homer. *See United States v. Ginsberg,* 758 F.2d 823, 828 (2d Cir. 1985) ("Probable cause for arrest exists where the facts and circumstances *within the officers' knowledge* and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.") (emphasis added). To be sure, even if Detective Conte or Officer Lombardi did not know the exact number of licenses, the Blaize Affidavit could serve as a proxy for their experience and expertise as law enforcement officers that any firearm they observe, particularly

late at night in South Queens, is likely to be unlawful.[15] *But cf. Black*, 707 F.3d at 540 (holding that the fact that an officer had never seen anyone in a particular area openly carry a weapon in an open carry state did not give rise to reasonable suspicion because the law's application did not vary by area).

But the probable cause inquiry does not solely look to officers' experience about what conduct is criminal—courts must view the facts as the officers knew them in light of the specific crime. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). In New York, a handgun license "*shall* be issued to . . . have and carry concealed, without regard to employment or *place of possession* subject to the restrictions of state and federal law, *by any person.*" N.Y. Penal Law § 400.00(2)(f) (emphasis added). The Second Amendment only allows state governments to condition licensure on objective criteria. *See Bruen*, 597 U.S. at 11. "Individuals holding a firearm license are exempt from most (but not all) of New York's criminal prohibitions on firearm possession." *Antonyuk v. Chiumento*, 89 F.4th 271, 305 (2d Cir. 2023); *see also* N.Y. Penal Law § 265.20(a) (exempting criminal possession of a weapon under §§ 265.01, 265.01-b, 265.02, and 265.03 from prosecution). The Second Amendment, as interpreted in *Bruen*, presumptively guarantees the right to bear arms in public. *Bruen*, 597 U.S. at 33.

Thus, the analysis does not contemplate the precise quantification of whether Mr. Homer had a license, *see Pringle*, 540 U.S. at 371, but rather whether there was a "specific and articulable fact" known to the officers about Mr. Homer that would make it unlikely that he was licensed to carry a firearm. *United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008). In light of the broad statutory language concerning eligibility for concealed-

---

[15] As noted above, the Government could have brought a witness to testify about exactly this at the evidentiary hearing but did not do so. (*See* Gov't Post-hearing Opp. at 9.)

carry licenses, the Blaize Affidavit, had it been timely presented to the court, would not have changed the outcome.

### 2. Homer shouted that the gun was planted after his arrest

The Government asserts that probable cause existed because Mr. Homer, "seconds after the recovery of the gun and prior to his arrest, immediately began shouting that the police planted a gun on him." (Mot. for Recons. at 15.) In its M&O, the court did not address the timing of Mr. Homer's statements, noting only that "[a]t 2:25 a.m., NYPD officers pulled up to the silver minivan that Detective Conte observed and then immediately arrested and disarmed Mr. Homer." (M&O at 2.) The court characterized both the arrest and disarming of Mr. Homer as happening simultaneously. Based on the court's finding, any statements made after the recovery of the gun were also made after his arrest. Post-arrest statements cannot be the basis for probable cause. *See Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020) ("Like all seizures, the officer's action must be justified at its inception."). The Government does not contend here that the court committed clear error or misapplied Second Circuit law in its determination that the recovery of the gun occurred after the arrest, and so the Government's argument is not properly raised on this motion for reconsideration.

For the sake of clarity, the timeline of Mr. Homer's arrest, as relevant for the timing of his statements, is as follows.[16] At 2:25:45 a.m., the car in which Officer Lombardi is riding arrived at Mr. Homer's van and Officer Lombardi exited the vehicle. At 2:25:50 a.m., Officer Lombardi approached the driver's door of Mr.

---

[16] The following timeline is taken from Officer Lombardi's body worn camera (Gov't Opp. to Mot. to Suppress, Ex. C) and the ARGUS camera footage. (Gov't Opp. to Mot. to Suppress, Ex. A ("ARGUS Footage").) The entire arrest occurred in under a minute, so the court timestamps to the second.

Homer's vehicle, where Mr. Homer was seated, and said "Yo, show me your hands." Another officer approached the passenger door with his weapon drawn. At 2:25:52 a.m., Officer Lombardi opened the door and ordered Mr. Homer to "step out" three times. From 2:25:54 to 2:26:00 a.m., Officer Lombardi and two other officers pulled Mr. Homer out of the car and put him on his back. At 2:26:01 a.m., Officer Lombardi recovered the firearm and Mr. Homer said, "He's going to shoot me." At 2:26:04 a.m., one of the arresting officers ordered Mr. Homer to "roll over, roll over," and two officers proceeded to handcuff Mr. Homer from approximately 2:26:06 a.m. to 2:26:24 a.m. At 2:26:11 a.m., while the police were placing him in handcuffs, Mr. Homer shouted something indiscernible and then, "He's planting a gun on me."

A person is under arrest when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir. 1991). To determine whether a suspect is under arrest, the Second Circuit looks to the need for the use of force, including whether the suspect is armed, the extent to which the suspect's freedom of movement is restrained, including use of handcuffs, and the number of agents involved, including the extent to which the suspect is outnumbered and surrounded. *See United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995); *Oliveira v. Mayer*, 23 F.3d 642, 646 (2d Cir. 1994) (collecting cases).[17] As

---

[17] Many cases discussing the definition of an arrest do so in the context of determining when a *Terry* stop has ripened into an arrest. *See, e.g., United States v. Newton*, 369 F.3d 659, 674-75 (2d Cir. 2004). The Government here does not argue that this arrest was initiated as a *Terry* stop. In fact, as noted above, it challenged as impracticable the court's dicta that police had the option to conduct a *Terry* stop. *But see Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017) ("[A] police officer, faced with the possibility of danger [during a *Terry* stop], has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless

of 2:26:00 a.m., when Mr. Homer was on the ground on his back with his hands above his head surrounded by three police officers, a reasonable person would believe that he was under arrest and not free to leave. Six seconds later, when Mr. Homer was disarmed and police were putting him in handcuffs, he was certainly under arrest. *See United States v. Fiseku*, 915 F.3d 863, 871 (2d Cir. 2018) ("We generally view handcuff use as a hallmark of a formal arrest."). Mr. Homer was under arrest before he made the statement that the Government argues established probable cause. The court therefore does not reconsider its finding that Mr. Homer was arrested prior to Officer Lombardi's recovery of the firearm and to any of Mr. Homer's statements made immediately after.

### 3. Overlooked Facts

Finally, the Government argues that the court overlooked key facts when it granted Mr. Homer's suppression motion: (1) Detective Conte served on a long-term investigation of a gang in the area, (Mot. for Recons. at 16); (2) Mr. Homer grabbed a loose firearm when there were two other passengers in the car, (*id.* at 14); (3) Mr. Homer only reached for the firearm and left his vehicle when another vehicle arrived, (*id.* at 15); and (4) Mr. Homer's conduct is inconsistent with the training the gun licensing statute requires for a person to lawfully acquire a firearm. (*Id.* at 16.)

In granting Mr. Homer's motion to suppress, the court concluded that the Government had not established that the facts leading up to Mr. Homer's arrest created probable cause to believe that Mr. Homer unlawfully possessed the firearm, and so his arrest was unreasonable, in violation of the Fourth Amendment. In reviewing the motion, the court necessarily addressed the extent to

---

of whether probable cause to arrest exists.") (quoting *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990)).

which *Bruen's* expansion of the conduct that is protected under the Second Amendment affected when a search and seizure under the Fourth Amendment is reasonable. (*See* M&O at 9-10.)[18]

In coming to its conclusion, the court considered the totality of the circumstances of the arrest, including facts the Government asserts were overlooked. The court considered, for instance, that on the night of Mr. Homer's arrest, Detective Conte was using an ARGUS camera[19] to surveil Guy R. Brewer Boulevard between 134th Street and 137th Street, which was known as a high crime area. (*See* M&O at 1-2, 11-12.) The court reasoned that a high crime area is relevant because it provides context that allows police to infer criminality from otherwise benign conduct. But because of the broad language of New York's amended licensing statute N.Y. Penal Law § 400.00(2)(f) and the Supreme Court's reasoning in *Bruen* that the Second Amendment protects the right to carry a firearm in self-defense, including Justice Alito's concurrence that law-abiding citizens are most likely to need to defend themselves in high crime areas, the court did not place significant weight on the time (at night) and location (high crime area) of the arrest.

---

[18] It is important here to again note the breadth of *Bruen* and the Court's other Second Amendment jurisprudence. *Bruen* held that the Second Amendment presumptively protects a right to bear arms in public for self-defense. *See Bruen*, 597 U.S. at 33. "The right to 'bear arms' refers to the right to 'wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready . . . in a case of conflict with another person." *Id.* at 32 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008)). And *Bruen* affirmed that the "constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)).

[19] The court had the benefit when deciding its motion of being able to review this uninterrupted video feed of the events preceding the arrest as well as the arrest itself. (*See generally* ARGUS Footage.) The feed showed what Detective Conte viewed before the arrest was initiated.

The court also considered the fact that Detective Conte was sur-
veilling the specific section of Guy R. Brewer Boulevard as part
of an investigation into a local gang, (*see* M&O at 2), and that
Detective Conte saw Mr. Homer driving a car that Detective
Conte testified was associated with the gang that he was surveil-
ling.[20] New York law restricts concealed carry licenses to those
with "good moral character," defined by statute as "the essential
character, temperament and judgement necessary to be en-
trusted with a weapon and to use it only in a manner that does
not endanger oneself or others." N.Y. Penal Law § 400.00(1)(b).
The court acknowledged Detective Conte's assessment but did
not find alleged gang membership to be relevant for assessing
whether a person is licensed to carry a gun because New York's
"shall issue" licensing regime does not facially preclude persons
with alleged gang associations from carrying a firearm. (*See*
M&O at 13.) This was particularly true because Detective Conte
did not clearly tie Mr. Homer to the gang he was investigating.
The basis for the Government's inference that Mr. Homer was
affiliated with the local gang was that Detective Conte had seen
the silver minivan once before while reviewing ARGUS footage
and believed it to be gang affiliated. But Detective Conte con-
ceded that he could not identify the license plate and that he did

---

[20] The Government argues that court overlooked the fact that Detective
Conte served on a long-term investigation of the local gang and that this
investigation was precipitated by a homicide. (*See* Mot. for Recons. at 16.)
The court directly considered that Detective Conte was surveilling Guy R.
Brewer Boulevard as part of an investigation into a gang but did not spe-
cifically state that it was a long-term investigation because of a murder.
Rather than arguing that the court overlooked a relevant fact, the Govern-
ment appears to be arguing that the court did not place enough weight on
Detective Conte's testimony.

not recognize any of the minivan's occupants.[21] Such a loose association cannot be the basis for probable cause because the Fourth Amendment requires individualized suspicion. *See Chandler v. Miller*, 520 U.S. 305, 308 (1997). It is true that applicants for a concealed carry license of course must have "good moral character," but someone with a loose association to a gang could submit character references and take the required training courses that are necessary to qualify for a concealed carry permit. (*See* M&O at 13.) The court therefore did not find Mr. Homer's purported ties to the local gang to provide strong support for Detective Conte's belief that Mr. Homer lacked a firearm license.

The Government also argues that the court overlooked evidence that Mr. Homer was going to unlawfully use the firearm, and therefore that Detective Conte had probable cause to believe that Mr. Homer unlawfully possessed the firearm. Even after *Bruen*, the right to bear arms does not extend to using guns for illegal conduct. In the probable cause inquiry, the court must give due weight to the testimony of law enforcement. As the Second Circuit explained,

> Some patterns of behavior which may seem innocuous enough to the untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before. As long as the elements of the pattern are specific and articulable, the powers of observation of an officer with superior training and experience

---

[21] While the inference that the driver of the car is its registered owner is reasonable, *see Kansas v. Glover*, 140 S. Ct. 1183, 1189 (2020), drawing a further inference of gang affiliation based on the car is less so. *See id.* at 1191 (Kagan, J., concurring) ("Families share cars; friends borrow them."). In this case, at a subsequent hearing, the defense represented that the car that Mr. Homer was driving was registered to a relative of his partner. (*See generally* Nov. 21, 2023 Bond Modification Hearing Transcript.)

> should not be disregarded. *United States v. Delos-*
> *santos,* 536 F.3d 155, 161 (2d Cir. 2008).

In his testimony, Detective Conte identified two specific and articulable elements of Mr. Homer's conduct that the Government argues were indicative of criminality: Mr. Homer was in the driver's seat of a vehicle associated with a gang and he did not have firearm discipline, as he put the gun directly in his pocket. (*See* Hearing Tr. at 18:12-13; 28:8-9; 31:16-17.) These were also the only facts that the Government raised in its post-hearing briefing. (*See* Gov't Post-hearing Opp. at 11.)

However, the court has already considered these generalized elements. For the reasons discussed above and because Detective Conte did not more specifically articulate a basis for believing that the vehicle was associated with a gang beyond seeing it once before on video, the court credited Detective Conte's testimony only insofar as it established that Mr. Homer could loosely be associated with members of a gang. And the court held that Mr. Homer's lack of firearm discipline, though potentially inconsistent with the safety training that is required under New York law to receive a concealed carry permit, was not enough to indicate that Mr. Homer did not have a license. This is particularly true because the conduct that Detective Conte stated was evidence of a lack of firearm discipline—that he "took the gun out and put it in his pants pocket"—appears to fall precisely within the conduct that is presumptively protected under the Second Amendment after *Bruen. See Bruen,* 597 U.S. at 32 (defining the right to bear arms the "right to wear, bear, or carry upon the person or in the clothing or in a pocket"). On these bases, the court ruled that based the facts leading up to Mr. Homer's arrest, the arresting officers lacked sufficient probable cause to arrest Mr. Homer.

The Government now argues on reconsideration that additional facts support a finding of probable cause: (1) there were other

passengers in the car when Mr. Homer grabbed a "loose" firearm, and (2) Mr. Homer reached for the firearm only when another vehicle arrived, indicating an intention to use the weapon unlawfully.[22] These additional facts, the Government contends, are also inconsistent with the licensing statute's requirements for a person to lawfully acquire a concealed carry license.

Even if seemingly innocuous to the average person, the court cannot disregard conduct that law enforcement officers identify as indicative of criminal activity. *See Delossantos*, 536 F.3d at 161. But in his testimony, Detective Conte did not address either of these points. He did not mention the risk of possessing a firearm in a car with two other passengers, nor did he identify the firearm as "loose."[23] The extent of his testimony on this subject was that he "noticed that there was a female in the vehicle also" and that Mr. Homer "had no firearm discipline. He took the gun out and put it in his pants pocket." (Hearing Tr. 31:13-17.) And concerning the Government's argument that Mr. Homer intended to use the firearm unlawfully when he left his vehicle, Detective Conte said only that Mr. Homer was "out of the car and at the deli." (Hearing Tr. at 33:2.)

The court is therefore asked in this motion to reconsider the extent to which seemingly innocuous conduct is indicative of criminality without the aid of law enforcement testimony that states as much. Though courts do not necessarily require specific law enforcement testimony about how seemingly innocuous conduct is indicative of criminality, *see United States v. Steppello*, 664

---

[22] The Government also argued that the court overlooked the fact that Detective Conte was on a long-term investigation of a gang in the area as a result of a homicide. (Mot. for Recons. at 16.) Because the court considered that Detective Conte was investigating a local gang, it does not re-address the Government's argument on reconsideration. *See Corpac*, 10 F. Supp. 3d at 351; *see also supra* note 20.

[23] Nor did the Government address these facts in its post-hearing briefing.

F.3d 359, 364 n. 6 (2d Cir. 2011) (not requiring specific agent testimony to interpret a phone call to set up a drug deal when the "use of code language . . . is chronicled regularly in our cases"), it is certainly helpful. *Cf. Delossantos*, 536 F.3d at 160-61 (relying on agents' testimony that, based on their experience, a bystander to a drug deal is normally involved in the drug deal and is not likely to be an "innocent dupe"). The court therefore considers whether either of these additional facts, viewed individually and in connection with the totality of facts before the court, demonstrate probable cause.

> a.   *Loose Firearm with Other Passengers*

The Government argues that the court overlooked the fact that "the minivan had two additional passengers when the defendant grabbed a loose semi-automatic firearm and shoved it in his pocket." (Mot. for Recons. at 14.) This conduct created probable cause to believe that Mr. Homer was not licensed, contends the Government, because someone with good moral character who has received safety training about firearm storage would not handle a firearm in a way that could endanger the other passengers. The Government does not argue that probable cause existed based on violation of a firearm storage statute or for criminally endangering the other passengers; it only argues that probable cause existed because the storage was inconsistent with the licensing requirements.

In the M&O, the court held that "while a lack of firearm discipline is inconsistent with the training that one would have to undergo to acquire a license to carry a firearm, it is too large a leap to conclude that lack of firearm discipline implies that the firearm is unlicensed." (M&O at 13.) The court's assessment of Mr. Homer's lack of firearm discipline was based on Detective Conte's testimony during the evidentiary hearing when he was narrating the ARGUS footage for the court:

> Q: And what, if anything, did you note about the manner in which the gun was being safeguarded, if at all?
>
> A: He had no firearm discipline. He took the gun out and put it in his pants pocket. (Hearing Tr. at 31:14-17; *see also* ARGUS Footage at 21:50.)

Detective Conte did not state from where Mr. Homer retrieved the firearm, and it is not clear from the video. Mr. Homer contests the argument that the firearm was loose, reasoning that Detective Conte's language—"took the gun out"—implies that it was in something and not loose. (Opp. to Mot. for Recons. ("Opp.") at 7.) Regardless of whether the gun was "loose," it was not securely on Mr. Homer's person at all times. The Government now argues that this shows that Mr. Homer did not have "good moral character" and therefore could not have acquired a firearm license. (Mot. for Recons. at 15-16.)

To assess moral character, applicants for a concealed carry license are now required to submit four character references, contact information for cohabitants, and their personal social media pages. *See Antonyuk v. Chiumento*, 89 F.4th 271, 290 (2d Cir. 2023) (citing N.Y. Penal Law § 400.00(1)(o)). Similar to Mr. Homer's placement of a firearm directly in his pocket, his conduct here was inconsistent with the safety training that a licensee would have been required to take. The fact that Mr. Homer did not have the firearm on his person with other inhabitants in the car poses a greater safety risk than putting a gun directly in one's pocket. But such conduct, in a state that "shall" issue a firearm license to "any person," N.Y. Penal Law § 400.00(2)(f), is not enough to infer that the firearm is unlicensed.

### b. *Conduct at Deli*

The Government argues that the facts support a finding of probable cause because Mr. Homer "armed himself in that moment

to use or potentially use the gun on the sidewalk, and therefore unlawfully." (Mot. for Recons. at 15.) Viewing the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 85 (2d Cir. 2002), the court is unable to conclude that Mr. Homer "armed himself in that moment to use or potentially use the gun on the sidewalk, and therefore unlawfully." (Mot. for Recons. at 15.) The court looks "at the facts as the officers knew them in light of the specific elements of each crime." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). "[N]o probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity." *United States v. Valentine*, 539 F.3d 88, 94 (2d Cir. 2008).

The facts that the Government claims the court overlooked are as follows: Mr. Homer was in the driver's seat of the silver minivan when a car pulled up and stopped, double parking in front of his car. (ARGUS Footage at 21:44.) At that point, Mr. Homer turned around and put a firearm in his pocket and, with an occupant of the double-parked car, went to the deli window. (*Id.* at 22:25-22:34.) They both stood there while Mr. Homer appeared to be speaking and gesturing to someone off camera, at least a store front away. (*Id.* at 22:35-50.) Mr. Homer's acquaintance went back to his car to get a coat, and Mr. Homer temporarily left the deli window and walked halfway towards his acquaintance's car before returning to the deli window. (*Id.* at 22:45-23:04.) Both then stood there a few steps apart for about a minute, until a deli employee came to the window. (*Id.* at 23:04-23:56.) Mr. Homer grabbed something from the window

about thirty seconds later.[24] (*Id.* at 24:33.) He then returned to his car and sat there for about a minute before Officer Lombardi's police car arrived. (*Id.* at 24:41-25:45.)[25] Throughout the approximately two minutes he was in front of the deli, Mr. Homer frequently looked off camera in the same direction that he had gestured earlier.

The Government does not specify what unlawful activity it believes Mr. Homer was arming himself to commit while standing in front of the deli. Instead, the facts that the Government asserts the court overlooked at the very most create "suspicion of some generalized misconduct." *Gonzalez,* 728 F.3d at 155. Mr. Homer and his acquaintance are not pacing back and forth or making repeated trips in a way that would indicate casing a job. *Cf., e.g., Terry v. Ohio,* 392 U.S. 1, 5-6 (1968). Mr. Homer did not brandish his firearm or otherwise indicate an intent to unlawfully use it. *Cf. Walczyk v. Rio,* 496 F.3d 139, 147 n.7 (2d Cir. 2007) (noting that displaying firearms is a factor for determining whether there is fear of imminent physical injury). Mr. Homer's conduct in front of the deli did not indicate that criminality was afoot.

---

[24] The Government claims the court erred because "defendant did not go into the deli, and there is certainly no evidence that he ordered anything." (Mot. for Recons. at 15 n. 13.) Instead, the Government says Mr. Homer "loitered outside the business with a gun while gesturing to someone or something down the street." (*Id.*) Based on a review of the ARGUS video, the Government is mistaken. It appears that the Government did not notice that the deli had a service window, which allows a person to order something without going into the deli. The defense, in their opposition to the Government's motion for reconsideration, suggested that Mr. Homer grabbed cups. (Opp. at 7.)

[25] Mr. Homer contends that it is likely that Detective Conte did not even watch Mr. Homer while he was at the deli because Detective Conte testified that he "immediately got out of his seat" to go find someone to arrest him. (Opp. at 7-8 n.6.) But the camera followed Mr. Homer throughout and zoomed in and out, indicating that Detective Conte was actively viewing.

The court cannot "divide-and-conquer" what is meant to be an inquiry based on the totality of the circumstances. *See District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018). In its Order, the court found that law enforcement lacked probable cause to believe that a person had an unlicensed firearm when that person was loosely affiliated with a gang and was seen at night in a high crime area placing a gun directly into his pocket, because New York's licensing statute requires licensing officers to provide licenses to any person that satisfies the statutory requirements. The Government contends that ignoring Mr. Homer's conduct in front of the deli, including the fact that he armed himself when an acquaintance arrived, and that Mr. Homer did not have the firearm on his person with passengers in the car would change the totality of the circumstances analysis. But ultimately the issue is that Mr. Homer had a gun. If carrying a concealed gun is presumptively protected conduct after *Bruen,* then sitting in a car with a gun or leaving a car with a gun or standing in front of a deli with a gun are presumptively protected as well. The totality of the circumstances did not indicate that Officer Lombardi had probable cause to arrest Mr. Homer for possession of a firearm without a license.

The issue presented in Mr. Homer's case involved the intersection of a newly expanded Second Amendment with the legal protections of the Fourth Amendment in a state that had limited public gun carriage for over a hundred years. The extent to which police can infer a lack of licensure from the suspect's conduct in a state that now has limited discretion in declining to issue concealed carry licenses is not settled. While the issue is undoubtedly close, the Government has failed to demonstrate that reconsideration is warranted.

## IV. CONCLUSION

For the foregoing reasons, the court STRIKES footnote 3 of the M&O. The Government's motion for reconsideration is otherwise

DENIED. The Government's motions for oral argument and an evidentiary hearing are DENIED as moot.

SO ORDERED.


Dated:      Brooklyn, New York
            April 8, 2024

                                          s/NICHOLAS G. GARAUFIS
                                          NICHOLAS G. GARAUFIS
                                          United States District Judge